UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:15-CR-49-CDP |
| | ) |
| RAMIZ ZIJAD HODZIC, | ) |
| SEDINA UNKIC HODZIC, | ) |
| NIHAD ROSIC, | ) |
| MEDIHA MEDY SALKICEVIC, | ) |
| ARMIN HARCEVIC, | ) |
| | ) |
| Defendants. | ) |


MOTION HEARING

BEFORE THE HONORABLE CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

JANUARY 28, 2019


APPEARANCES:

For Plaintiff          Matthew T. Drake, AUSA
                       Howard J. Marcus, AUSA
                       Kenneth R. Tihen, AUSA
                       **OFFICE OF U.S. ATTORNEY**
                       111 South Tenth Street, 20th Floor
                       St. Louis, MO  63102

                       Joshua D. Champagne, AUSA
                       **U.S. DEPARTMENT OF JUSTICE**
                       950 Pennsylvania Avenue, N.W.
                       Washington, DC 20530

**APPEARANCES CONTINUED ON PAGE 2**

*REPORTED BY:          Gayle D. Madden, CSR, RDR, CRR*
                       *Official Court Reporter*
                       *United States District Court*
                       *111 South Tenth Street, Third Floor*
                       *St. Louis, MO  63102      (314) 244-7987*
                       (Produced by computer-aided mechanical stenography.)

1/28/2019 Motion Hearing

2

**APPEARANCES CONTINUED:**

| | |
|---|---|
| For Defendant<br>Ramiz Zijad Hodzic | Diane Dragan, AFPD<br>Kevin Curran, AFPD<br>Michael Dwyer, AFPD<br>**OFFICE OF U.S. PUBLIC DEFENDER**<br>1010 Market Street, Suite 200<br>St. Louis, MO  63101 |
| For Defendant<br>Sedina Unkic Hodzic | Kim C. Freter, Esq.<br>**LAW OFFICE OF KIM C. FRETER**<br>225 South Meramec, Suite 1100<br>St. Louis, MO  63105<br><br>Daniel Schattnik, Esq.<br>3 South 6th Street<br>Wood River, IL  62095 |
| For Defendant<br>Nihad Rosic | JoAnn Trog, Esq.<br>**MENEES, WHITNEY, BURNET & TROG**<br>121 W. Adams<br>Kirkwood, MO  63122 |
| For Defendant<br>Mediha Medy<br>Salkicevic | Joan K. Miller, Esq.<br>**JOAN K. MILLER, LLC**<br>1515 N. Warson Road, Suite 249<br>St. Louis, MO  63132 |
| For Defendant<br>Armin Harcevic | Charles D. Swift, Esq.<br>**CONSTITUTIONAL LAW CENTER FOR MUSLIMS<br>IN AMERICA, INC.**<br>833 E. Arapaho Road, Suite 102<br>Richardson, TX  75081 |

1        (Proceedings commenced at 2:47 p.m.)

2        (The following proceedings were held in open court and

3    with the Defendants present.)

4            THE COURT:  All right.  Good afternoon.  We're

5    continuing the hearing that Judge Noce just started.  His part

6    of this hearing was the status hearing, and I'm here to talk

7    about the motion regarding lawful combatant status, but

8    because this is the first time I have been here or seen the

9    Defendants, I'd like to have everyone introduce themselves.

10   Let me start with the Government.  Some of these people at the

11   Government table, I do not know.  So, Mr. Drake, do you want

12   to tell me who's here on behalf of the United States?

13           MR. DRAKE:  Matthew Drake, Your Honor.  We also have

14   Howard Marcus, who you're familiar with.  This is Josh

15   Champagne from the National Security Division in the

16   Counterterrorism Section.  And Mr. Cichacki is the case agent

17   with the St. Louis City Metro Police Department, and he is

18   also a task force officer with the FBI.

19           THE COURT:  And your -- what was his name?

20           MR. DRAKE:  Joseph Cichacki.

21           THE COURT:  Okay.

22           MR. DRAKE:  I've given the spelling to the court

23   reporter as well.

24           THE COURT:  Okay.  All right.  And then for the

25   Defendant, Ms. Dragan, would you -- just taking them in order,

4

1   if you would introduce yourself and cocounsel and your client.

2          MS. DRAGAN:  Sure.  Diane Dragan.  We also have

3   Michael Dwyer and Kevin Curran here, and we represent

4   Mr. Hodzic, who is there in the front, standing up.

5          THE COURT:  All right.  Thank you.

6          And, Ms. Freter.

7          MS. FRETER:  Kim Freter and Dan Schattnik.  And we

8   represent Ms. Hodzic, who is also standing up.

9          THE COURT:  All right.  And, Ms. Trog.

10          MS. TROG:  Your Honor, JoAnn Trog, and I represent

11   Mr. Rosic, and I just ask him to stand up.

12          THE COURT:  All right.  Thank you.

13          And let's see.  Yes, Ms. Miller.

14          MS. MILLER:  Your Honor, Joan Miller, representing

15   Ms. Medy Salkicevic.  There's also Andrea Gambino who is not

16   present today.

17          THE COURT:  Okay.  And then, Mr. Swift.

18          MR. SWIFT:  Good afternoon, Your Honor.  Charles

19   Swift.  My partner on this case, Catherine McDonald, is not

20   present today.  We represent Armin Harcevic, who is present in

21   court and standing.

22          THE COURT:  All right.  Thank you.

23          All right.  Obviously, this is Judge Noce's

24   courtroom.  He's taller than I am.  So I apologize for being

25   hidden up here.

1          What I wanted to hear today was your arguments on the

2    lawful combatant defense.  I have studied everything and wish

3    to hear the legal and other arguments.

4          Have the defense counsel agreed on a way to divide up

5    this time?

6          MR. SWIFT:  We have, Your Honor, and I will take the

7    argument for the defense.

8          THE COURT:  All right.  You can proceed.

9          MR. SWIFT:  Yes, Your Honor.  If it please the Court,

10    may I reserve three minutes of my time?

11          THE COURT:  Yes.

12          MR. SWIFT:  Thank you, Your Honor.

13          The underlying charge, the misconduct charged, in

14    large part, as the 2339 -- for the 2339A violations, is murder

15    and maiming abroad.  Murder and maiming abroad is defined by

16    U.S. law.  The Magistrate Judge in this case, in his

17    well-reasoned opinion, recognized that the U.S. Supreme Court

18    has long held that in the context of a recognized civil war

19    normal acts of war do not constitute a crime, that they are

20    immune under the doctrine later of combatant immunity.

21          The charged activity in this case is as foreign

22    fighters participating in an ongoing conflict in Syria.  This

23    case is remarkably analogous to the original case decided by

24    the Supreme Court, and that's *United States v. Palmer*.  In

25    that case, as the same as these cases, Justice Marshall found

1    that where a recognized civil war existed, that it would

2    violate neutrality to prosecute any act that would be

3    regularly convened under the laws of war, that is any

4    combatancy act, inside it.

5            It's important to note that at that time combatant

6    immunity was not generally enjoyed in civil wars.

7    Nevertheless, that was Justice Marshall's decision.  It was a

8    consistent decision of the Supreme Court also in the Civil War

9    and most recently in the Mexican -- the U.S. Mex -- or --

10   excuse me -- the Mexico civil war at the beginning of this

11   century or the last century.

12           THE COURT:  Those were all before the Geneva

13   Conventions; correct?

14           MR. SWIFT:  That's correct, Your Honor.

15           THE COURT:  And so the Government's position is that

16   the Geneva Conventions control and not the common law as you

17   are arguing.

18           MR. SWIFT:  Right.

19           THE COURT:  What's your response to that?

20           MR. SWIFT:  The first part starts in the text.  The

21   text is that Common Article 3 is a minimum, not a maximum.  It

22   is the minimum that is to be provided, and it would take the

23   strange idea that the Geneva Conventions actually stripped

24   away rights, and they were -- actually, put forward greater

25   rights than had ever been before inside conflicts.  They

1   weren't a reduction in rights.  As the commentary cited by the

2   Magistrate and cited by us indicates, the nations couldn't

3   agree in the context of internal armed conflict or civil wars

4   or the like, in the part, so that we came up with a minimum

5   that everyone was willing to adopt, but nation-states were

6   free.  Thus, under international law, remembering under our

7   principles of applying U.S. law, there is no conflict with

8   continuing to apply our higher standards.  In fact, nations

9   were encouraged to do so in this context.  So Common Article 3

10  does not strip away something.  It didn't make lesser

11  protections.  In fact, it extended protections for the first

12  time because, in many parts of the world, the idea that -- you

13  know, if there was a rebellion, you just simply killed

14  everybody who participated, without trial or without part on

15  it, and the attacks, et cetera, were well known.  They tried

16  to alleviate some level of suffering, but they didn't.  They

17  created a floor, not a ceiling, and the language and the

18  intent of the drafters is quite clear.

19          The second part on it is -- you know, part goes -- is

20  that this somehow changed our laws, and as I said, under

21  international law, our interpretation is it doesn't see how it

22  could possibly do so when it's so limited.  The conflict here

23  is quite clearly inside the part our laws were to extend that.

24  Nothing in the Geneva Conventions says you shouldn't do that.

25          And so in our part on it, if you continue to follow

1   the -- if the Court follows as the Magistrate did, the

2   well-reasoned principles of both international law and our

3   interpretations of it and applies our law, which is what

4   you're directed to do under murder and maiming, then the

5   answer is what comes out.

6           And, you know, lastly, there's a strong policy

7   reason, as Justice Marshall observed at the very beginning.

8   Under the Government's theory, anyone fighting Assad and his

9   troops are criminals.  They have to be.  They're all criminals

10  in the eyes of the United States.  The victim witness

11  statements come from Assad.  This Court finds itself in the

12  very difficult position of prosecuting a war in which we are

13  on the -- somewhat on the opposite side, although during this

14  period of time, arguably, both maintaining neutrality in the

15  sense that we don't have troops on the ground and supporting

16  the other side, and one would find itself the strong policies

17  of Justice Marshall still kick in.  There is no obligation in

18  this part under international law not to extend the

19  protections.

20          It's also -- when moving to the 9-11 cases, the

21  post-9-11 combatant immunities, this is clearly a different

22  situation than we faced in those other cases, Your Honor.

23  First off, starting with Afghanistan, one of the -- all of the

24  other cases differ in that we are a party to the conflict, and

25  if one applies in that part we're a party -- in other words,

1   we're participating.  In Afghanistan, it's our troops on the

2   ground.  In Iraq, it's our troops on the ground that are being

3   attacked.  In those parts, I'd argue that in each one of the

4   cases where it came up, they were more of an insurgency than

5   an actual civil war, where we don't have two armies, per se,

6   in the field, as we did in Syria, on part, a Coalition set of

7   forces and the government forces.

8          More importantly, though, whether to extend the

9   protections in a civil war or in an insurgency where we're the

10  protections would be a policy decision case by case by

11  conflict.  Where in this case, we aren't a party.  We aren't

12  the people being attacked, and that's a significant difference

13  from all of the others inside the context here, Your Honor,

14  and its analysis.

15         And in fact, returning to Geneva, this conflict --

16  even the text of Common Article 3 wouldn't necessarily apply

17  to the United States in that part because Common Article 3

18  applies to those who are involved in the conflict, and there,

19  we are not during the relevant portions of the indictment.  I

20  realize that the United States later put troops on the ground.

21  It changes the analysis, but we analyze it from there.

22         The next part is that where we start to disagree with

23  the Magistrate Judge comes into this idea of supporting

24  foreign terrorist organizations.  We would sit there and say

25  that that phrase is just simply too unclear.  What's clear

1   what's being charged is engaging in hostilities.  What

2   "support" means -- and I think this is where we borrow wrongly

3   from 2339B instead of 2339A.  Support in that could be in the

4   same coalition without being under the direct control of the

5   organization.  Support associated within the context of the

6   Syrian War, where they're all fighting a common enemy, at

7   least during this period of time, is not meaningful to

8   disengage from the idea and say, well, this isn't -- we aren't

9   charging the Free Syrian Army.  In fact, the Government was

10  quick to point out in its motion that we could charge the Free

11  Syrian Army.  It doesn't matter.

12          Now, we also put forth, Your Honor, that this is a

13  jurisdictional issue.  It was in *Palmer*.  The Court's very

14  clear on that.  In all the post-9-11 cases, the Court's very

15  clear on that.  It's a jurisdictional issue, and the reason is

16  that lawful soldiers, you know, people who are engaging in

17  lawful acts of combat, aren't to be tried.  On part.  And when

18  we said in this part, even if one were to expect that there is

19  some potential that there's unlawful combat in here, the

20  problem is when we get to the grand jury, we don't know what

21  they indicted on given that phrase.  Did they indict based on

22  the evidence that he participated in the Free Syrian Army and

23  the other organization, or did they indict based on he's

24  fighting under the direct command and control of ISIS?  We

25  don't know, and from the affidavit or from the indictment, we

1    simply don't know what was the basis for the charge, the

2    underlying charges of murder and maiming based on Pazara's

3    conduct.

4            So we find ourselves in a part where, you know, we

5    can't really skirt it as a trial instruction because there's a

6    real possibility that the grand jury indicted on exactly the

7    same stuff that is now ruled out of bounds.

8            So we agree, you know, in large part with the

9    Magistrate's analysis of the issue that lawful combatant --

10   that combatant immunity has to exist here for the forces under

11   U.S. law or for the forces that we put forth evidence that

12   Pazara was with.

13           THE COURT:  Well, do you think I have enough evidence

14   to rule that way?  You're saying it should be jurisdictional

15   and I should dismiss the indictment; right?

16           MR. SWIFT:  Yes, I do.

17           THE COURT:  And it not be a trial issue, as Judge

18   Noce said?

19           MR. SWIFT:  Right.

20           THE COURT:  And so you think you've presented enough

21   evidence for me to rule on that as a final matter?

22           MR. SWIFT:  Yes, we do, and the reason I say that is

23   we put forth affidavits, et cetera.  We could -- we have the

24   potential for depositions coming up shortly, which you would

25   have then testimony on it, but we've proffered for that

1    evidence, and we're willing to call experts.  We haven't been

2    afforded this opportunity.  I think we've proffered sufficient

3    evidence that you could rule on, but we haven't been afforded

4    the opportunity yet to put that evidence on.  We certainly can

5    do that inside the context of this.  And we put forward that

6    once we do that, the burden shifts over to the Government.

7         The Government has taken the position that there's no

8    need for a hearing because such a hearing would not -- no one

9    in Syria has combatant immunity; therefore, it doesn't matter

10   what unit you were fighting with; it doesn't matter whether

11   you were wearing uniforms; it doesn't matter whether you were

12   generally complying with the laws of war and whether these

13   acts were specific to -- that their actions constituted

14   regular attacks or regular combatancy as described by then

15   Chief Justice Marshall.  No one put out the idea, for

16   instance -- I think Justice Marshall's part was very important

17   in the process because, you know, again, if the evidence had

18   been that Captain Palmer had, you know, laid waste to civilian

19   populations, I don't think he'd have been in the same

20   position.  You know, what we had after trial was that he

21   engaged in normal activities of war, which at that time

22   included seizing of merchant ships in the process under a

23   Letter of Marque.

24        So, yes, I feel that we've proffered sufficient

25   evidence, Your Honor.  I do want to go back on part.  There's

1  been no evidentiary hearing, and I would think that there

2  would be a need for an evidentiary hearing potentially.

3          Our concern is that -- you know, the overly broad

4  part two on this process inside the jurisdictional, and we

5  would point out, Your Honor -- and we've pointed this out in

6  our briefs in all these parts -- it has seemed to me from the

7  beginning that this is a 2339B case described as -- disguised

8  as a 2339A case.  Many of the concerns that are laid out by

9  the Government on supporting this action or this group or some

10  part.  On the modern battlefield, one finds many entities, and

11  that is not to say that the Government cannot say -- you know,

12  even maintaining neutrality -- sit there and say this

13  organization, if you give money to them, that's called

14  material support of terrorism under 2339B.  There is a -- in

15  fact, the organization that Pazara was was later designated a

16  year or so afterwards, but that process existed throughout,

17  and it can look at changing norms on the battlefield, changing

18  conditions on the battlefield, and changing tactics, but 2339B

19  provides that part on it.  It doesn't overly criminalize.

20  Instead of taking a sledgehammer and trying to slash -- smash

21  down, it allows with precision to isolate conduct that people

22  should know.

23          And you're stuck also here, Your Honor, with the part

24  where we find ourselves.  Here we have the President, during

25  these periods of time, making these statements against Assad,

1  supporting these forces.  The United States actually engaged

2  in support of them.  But does a reasonable person in the

3  civilian population of the United States think that he can't

4  provide any support?  No.  When that organization is

5  designated as a terrorist organization, we have a long string

6  of law here, of case law, that the reasonable person knows

7  they cannot.

8         And so from our perspective -- and we've always said

9  this -- that nothing prevents the Government from addressing

10  the concerns they have of foreign terrorist organizations by

11  charging this as a 2339B case.  It's not the all or nothing

12  that is perceived here or proposed here.  Hardly.  The

13  Government is not without remedies.

14         THE COURT:  Let me ask you this.  The Government

15  argues in its objections that the Fourth Circuit case that

16  came down changes things here because -- are there any cases

17  in -- in this or, I guess, in the last 100 years or so that

18  support your position?  All the case law is the opposite;

19  right?

20         MR. SWIFT:  Well, in the part I'm thinking, I think

21  Your Honor needs to take very clearly, though, all law of war

22  type parts, and I don't -- I disagree that the Fourth Circuit

23  case does because it's fact-specific, and you have to lie

24  inside fact-specific.  It has been a long time since the

25  United States took a position inside a civil war.  That's not

1  that unusual.  Most of them occur a long way away from us and

2  don't involve us.  So, you know, the part on this -- the part

3  is, okay, it's been 100 years, but we have been following this

4  sort of the case law, and I don't think that the Fourth

5  Circuit case in any way overrules the *Palmer* exception.  You

6  could see on its face.  If I had argued to the Fourth Circuit

7  *Palmer v. United States*, what would have they said?

8         Well, that was a foreign civil war which had been

9  recognized by the President, not an insurgency attacking us.

10         It would have been far different in their analysis on

11  the process, the part, where we find ourselves in a unique set

12  of factual circumstances that don't occur particularly

13  frequently but have been consistently handled in the same

14  manner.

15         And so part on the thing is that in this part is --

16  what the Government asks, Your Honor, is to criminalize on

17  part, and this has huge possibilities.  At the onset of this

18  war, hundreds, if not thousands, of Americans, Syrian

19  Americans particularly, provided support to the Free Syrian

20  Army.  Some years later, they now -- if the Government part is

21  on this -- to the legitimate forces, forces our own government

22  called the legitimate representatives of the Syrian people.

23  They're now criminals, whether indicted or not.  It can't be

24  both ways on part.

25         So we sit here and say, you know, the Government

1   needs to charge with precision, and we don't believe that the

2   Fourth Circuit case in any way -- it's a far different matter.

3   Had these -- had this charge been he's with ISIS forces that

4   attacked a U.S. base that had been later established in Syria,

5   Fourth Circuit is dead on.  That's not the facts here.

6         We would reserve the -- unless the Court has more

7   questions, I'll reserve the balance of my time.

8         THE COURT:  That's all right.  Okay.  You may.

9         I'll hear from the United States.

10        MR. DRAKE:  Thank you, Your Honor.  May it please the

11   Court.  I'd like to start with a review of some facts that the

12   parties agree on.  Mr. Pazara, Abdullah Ramo Pazara, who was

13   the main conspirator who these Defendants are alleged to have

14   supported, was a Bosnian refugee.  He was naturalized in this

15   very courthouse in May of 2013 by Judge Buckles.  He became a

16   U.S. citizen.  A week later, he left for Syria.  He arrived

17   there by July of 2013.  He joined a group of Bosnian

18   nationals, and they began to fight in the Syrian civil war.  A

19   civil war, Judge.  We all agree on that.  And they fought

20   against the Syrian government.  Within three weeks, he and

21   other Bosnians left that unit, and they assimilated into other

22   groups that were fighting in the region, and they continued to

23   do that through September of '14 when he was killed.  Those

24   are the facts that we all agree on, okay, Judge, and those are

25   sufficient facts for you to make your ruling as a matter of

1    law on the issues that I'm about to talk about.

2         Now, there are additional facts and circumstances

3    that would come about, and I'll address those later about the

4    groups that Pazara actually fought for, but you don't need

5    those facts to make your ruling.

6         In our objections to the R&R, we argued that the sole

7    source of law for combatant immunity is the Third Geneva

8    Convention, particularly Article 2.  When the U.S. ratified

9    that convention in 1949, it did so, and as the notes suggest,

10   it refined and codified common law.  As a result, it

11   superseded all prior law and became the exclusive and

12   controlling source of legal authority concerning lawful

13   combatant immunity.  In other words, there is no other source

14   of law for combatant immunity.  Period.  That's what

15   *Hamidullin* says, not as a fact question but as a question of

16   law.

17        And what the Defendants are asking this Court to do

18   is divert from precedent and extend the Geneva Conventions and

19   apply pre- or Civil-War-era common law or

20   pre-Geneva-Conventions common law and find that Abdullah

21   Pazara and his other insurgents that he fought with are

22   somehow entitled to the privilege of that immunity and

23   protection.

24        I would note, Judge, that we address in our brief

25   every district court, every appellate court, and the Supreme

1   Court have all used the Geneva Conventions as the basis for

2   evaluating lawful combatant immunity.  No district court, no

3   appellate court, and no Supreme Court case addresses it under

4   this Civil-War-era common law matter, and I'll address some of

5   those cases later in my argument, Your Honor.

6            Let's be -- let's cover the ground here of what the

7   Geneva Conventions are.  Basically, they make the fundamental

8   distinction between an international armed conflict and a

9   NIAC, a non-international armed conflict.  There are two types

10  of legal status there -- persons who are detained in a NIAC --

11  and that's what the U.S. is generally participating in the

12  modern times -- non-international armed conflicts.  Those

13  people are entitled to basic humanitarian protections, but

14  they are not entitled to combatant immunity in a NIAC, and it

15  should be that way because everyone should be treated

16  decently, Judge.  If you're captured in a battlefield, you

17  should get certain minimum humanitarian protections, and I

18  will address the Court's question in just a moment on that

19  issue.  But even though you should get minimum protections,

20  you should not be allowed to kill and murder.

21           There's a second matter that the Geneva Conventions

22  address, and that is an international armed conflict.  That

23  happens between High Contracting Parties or nation-states, and

24  in that situation, if a soldier is captured, he or she becomes

25  a prisoner of war, and you have treatment as such, and you may

1    qualify for combatant immunity.  So, in other words, the

2    provisions of the Geneva Convention apply during armed

3    international conflicts.

4           Because this is a civil war in Syria, this is not an

5    international armed conflict.  It is a NIAC, a

6    non-international armed conflict.  And as the Government has

7    argued, because it's not an international armed conflict,

8    under the existing law of the Geneva Conventions and every

9    other court that's examined it, that ends the analysis.

10   Period.  End of story.  As the *Hamidullin* court said, the

11   Geneva Convention's explicit definition of lawful combatant

12   status is controlling and conclusive.  Now, second, Judge, if

13   the Convention's prisoners of wars protection apply to the

14   Syrian conflict, Pazara also wouldn't be entitled to

15   protections as a lawful combatant immunity participant because

16   he was not acting on behalf of a High Contracting Party.

17   That's what the Geneva Conventions require.  He did not fight

18   on behalf of a state.  He was a U.S. citizen, naturalized by

19   Judge Buckles, and went to fight in Syria along with his other

20   insurgent mates, Judge.  Again, as a matter of law, based on

21   the facts that the parties have agreed to, the Court could end

22   its analysis there.

23          And I'd like to address *Hamidullin* for just a moment

24   and the effect it had.  Judge Noce did not have the benefit of

25   that decision when he issued his R&R, but that is the law, and

1    all the other courts that the *Hamidullin* court refers to is

2    the law.  While it might be slightly factually different,

3    we're talking about what the Court found as a matter of law,

4    and that is, I would say, very suggestive precedent for this

5    Court to consider.  It is explicitly clear that the *Hamidullin*

6    court found that lawful combatant immunity must apply only in

7    an international armed conflict.  It is the only path forward

8    for combatants to find that type of protection.  It

9    explicitly, unequivocally rejected the idea of

10   pre-Geneva-Convention common law war, and it said exactly what

11   I told you a moment ago, that the Geneva Conventions

12   superseded all of that.

13          And, Judge, I have an exhibit which I could proffer

14   to the Court and will, and the defense, I'm sure, is aware of

15   it, but it is the -- I'll call it Government's Exhibit 1.

16   It's the Government's brief in opposition to certiorari, which

17   substantiates all of what I'm telling you here today, Judge.

18          THE COURT:  And that's just pending decision on

19   whether they're going to accept cert; right?

20          MR. DRAKE:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MR. DRAKE:  Yes, Your Honor.

23          And I'd like to talk about our facts in this case,

24   Judge.  As I said, Pazara was a citizen, and he and other

25   nationals went to fight in the civil war.  They were not a

1    member of a state, and the civil war was not an international

2    armed conflict, and this Court doesn't need to go any further

3    as far as the Government is concerned and as far as *Hamidullin*

4    is concerned and as far as every other opinion is concerned.

5           But I do want to go a step further and make something

6    clear.  As the indictment points out, he fought for foreign

7    terrorist organizations, designated terrorist organizations.

8    The superseding indictment we're talking about is considering

9    alleging an offense that does that.  I have an exhibit marked

10   Exhibit 2, 3, and 4, which I will proffer to the Court today,

11   Judge.  Mr. Swift and the defense rely on a lot of media

12   reporting on the matter in support of their arguments in the

13   briefs, and Exhibit 2, which I would proffer to the Court for

14   whatever consideration it would give, is an *Atlantic* article

15   about Mr. Pazara's exploits -- this has all been provided to

16   the defense in discovery -- and how he participated as a

17   fighter for various foreign terrorist organizations.

18          The other one I would proffer, Judge, is what I'll

19   refer to as Government's Exhibit 3.  It is a -- it is a -- my

20   copy for the Judge.  It's a conversation between Mr. Pazara on

21   Facebook with an individual here in the United States, and in

22   that, he explicitly and clearly says, as early in the conflict

23   as April 22nd of 2013, that he has affiliated himself with

24   al Qaeda in Iraq.  Okay.  When asked later on in the

25   conversation, he also says, "I am fighting for Allah so we can

22

1    establish the Islamic State."  He later says, when asked,

2    "Yes, I'm a Mujahideen.  I fight for the Islamic State of Iraq

3    and Sham."

4           And it's not just what Pazara said, Judge.  It's what

5    the Defendants knew and what the Defendants know.  In

6    February, Mr. Hodzic, who is the principal Defendant in this

7    case -- and I would proffer Government's Exhibit 4, also

8    provided in discovery -- is seen wearing a shirt supporting

9    ISIS.

10          My point in this, Judge, is not to say that these are

11   facts you must rely on, but they're facts you could rely on,

12   and what I'm trying to draw the distinction for here is,

13   Judge, the absurd result would be -- is if somehow Pazara were

14   determined to be a lawful combatant who fought for a

15   designated foreign terrorist organization, we couldn't -- that

16   would be an absurd result.  We couldn't get there because

17   that's what he did and that's what the Defendants knew.  But

18   that's not what you need to find.  You need to find only what

19   I was mentioning earlier, that it's a non-international armed

20   conflict and that he was not a member of a High Contracting

21   Party.

22          I'd like to address some of their arguments, the

23   defense's arguments, and I'll start with the minimum standards

24   that you mentioned earlier in your questioning, Judge.  The

25   defense is basically arguing for an extension of the Geneva

1    Conventions and to say that the Geneva Conventions don't

2    prohibit the U.S. from granting lawful combatant immunity, and

3    they're right.  They don't prevent it.  That is true.  It

4    doesn't prevent the U.S. President from granting combatant

5    immunity, and frankly, the President can immunize all manner

6    of crime.  What the Third Geneva Convention and Article 3

7    provide is a minimum humanitarian treatment to prisoners in

8    non-international armed conflicts.  We all agree about this.

9    It's possible that this phrase might suggest that states

10   should be encouraged to afford better than minimum standards,

11   like Mr. Swift was mentioning, care for the sick and wounded.

12   Everybody's fine with that, Judge.  However, that's about the

13   treatment of prisoners.  That's about treatment of those

14   captured on the battlefield, not their legal status.  That's

15   why it doesn't apply -- lawful combatant immunity -- in those

16   minimum standards, and here's how we know that.  Article 3

17   expressly states in its final sentence that these are minimum

18   standards that shall not affect the legal status to the

19   parties to the conflict.  In other words, what it's saying is

20   we are asking you to consider additional standards for the

21   humanitarian treatment of people, not change their legal

22   status.  In other words, the Geneva Conventions contemplated

23   something like this coming up.

24          Think about it this way, Judge.  If the United

25   States -- if we follow their theory, if somehow the United

24

1   States were embroiled in some sort of fundamental crisis here

2   at home and, under the defense argument, when insurgents came

3   to the United States and took up arms in the conflict, it

4   would not be murder to kill as a legitimate act of war, even

5   in a civil war.  Taken to its logical conclusion, what they

6   would really be saying -- if that rebellion happened here and

7   those people that started the rebellion gained ground and

8   happened to kill people in our country and the rebels had

9   enough territory to renounce the President and they asked

10  other people to come and join their cause, that somehow we

11  couldn't prosecute those people in this country.  That's

12  ridiculous.  That's an illogical conclusion.  We absolutely

13  could.

14          You know what; Mr. Swift also brought up some

15  statements that the President made or the Government made

16  about the lawful combatant status of people, and I'd like to

17  address that.  First of all, they've never argued public

18  authority defense.  They're only arguing lawful combatant

19  immunity.  The defense has said that by saying that some of

20  these combatants are lawful combatants or legitimate

21  combatants or what have you, maybe the Free Syrian Army or

22  whatever, that this somehow absolves people of liability in

23  this country if they supported them, and that's simply not

24  true.  What those statements were were political statements,

25  Judge.  They were not meant to confer legal rights on

1   individuals and nor did they do so, and the defense doesn't

2   cite anything that says that they do confer legal rights.  In

3   fact, other cases such as *Hamidullin* and the other ones say

4   that they do not confer legal status, and they don't recite to

5   anything that says that it would, Judge.

6           I'd like to also address very briefly the *Prize*

7   theory of cases that they've talked about in their brief,

8   Judge.  This is where they find their common law error stuff.

9   Now, I would urge this Court to say we don't need to go this

10  far.  As I've mentioned, the Geneva Conventions are the law of

11  the land, and that's where we should stop our analysis.

12  However, I'd like to point out that no court has ever agreed

13  with the defense on this theory of common law

14  pre-Geneva-Convention-era combatant immunity.  What the *Prize*

15  *Cases* were about was whether or not President Lincoln could

16  use his powers to repel an insurrection.  He specifically was

17  talking or the Court was specifically talking about a blockade

18  of ships, the seizing of the ships, and the selling of those

19  ships.  They were not about the exercise of criminal laws.

20  The Court found that it was President Lincoln's decision how

21  and when to exercise his authority under the law and what to

22  do, and the President did confer immunity to Confederate

23  soldiers in those cases; however, he did so and he did confer

24  POW status not because he had to or a court required him to

25  but because he chose to, Judge, and the *Ford* case that is

1   cited by the defense points this out.  It says that United

2   States' sound policy and humanitarian reasons conceded to the

3   Confederates the status and rights as if they had been engaged

4   in war for an independent power.  The Court didn't compel that

5   decision.  That's a decision the President chose.

6           So if we go through the defense looking glass here,

7   Judge, and we accept their premise, the most important thing

8   that you need to think about with this portion of their

9   argument is -- think about this:  Even if World War II never

10  happened, the Geneva Conventions were never enacted, we never

11  adopted the standards of the Geneva Conventions, and the legal

12  framework in 1860 existed still today under these theories, it

13  would be up to the President to immunize Pazara and the

14  insurgents in the Syrian civil war.  The Presidents have not

15  chosen to do that, and they won't, and if they did, Judge, we

16  wouldn't be bringing this case, but that's what that theory of

17  cases and that line of cases talks about.  It's about the

18  exercise of presidential authority, not the legal right of the

19  combatants that are at issue here.

20          Judge, I guess here's our point in a nutshell.  We

21  believe that the defense is plainly wrong on the law, and we

22  believe *Hamidullin* is the controlling law on the subject

23  because it basically is a good summary of all of the laws on

24  the law, not the facts, but I think even under our facts, it

25  still controls.  And the facts that the parties agree to.

1          And there is a menu and a host of reasons why the

2    Court could find as a matter of law that lawful combatant

3    immunity doesn't apply.  First, as I mentioned, it's a

4    non-international armed conflict.  Geneva Conventions require

5    that.  Secondly, it could find -- this Court could find that

6    Pazara and the others that he fought with or who received the

7    support from the Defendants were not High Contracting Parties.

8    Third, I suppose if the Court were inclined, even if you went

9    down the defense -- in our opinion, humbly -- incorrect

10   political and legal interpretation of the law, Pazara and

11   those who received his support were not entitled to lawful

12   combatant status because the Presidents hadn't granted that

13   status to those type of combatants.

14          And I would invite this Court and encourage this

15   Court to join the Fourth Circuit and other district and

16   appellate courts that have addressed this issue and find that

17   lawful combatant immunity is not -- is not a matter that these

18   individuals should be entitled to receive as a matter of law.

19          Now, we've also addressed the need for an evidentiary

20   hearing.  The Government could certainly put on all kinds of

21   evidence about the foreign terrorist organizations, the

22   designated terrorist organizations, and the like, and we can

23   address Mr. Swift's other issues, but our point to Judge Noce

24   was and our point in the objections to the R&R is based on the

25   facts that the parties agree to, this is a question of law for

1  Your Honor, not a question of the facts.  You have sufficient

2  facts to make that determination.  In fact, if you look at all

3  of the cases that have come before it on all the precedent,

4  all of the courts have decided this as a matter of law and as

5  a matter of the facts that were before the court that the

6  parties agreed to.  There's been no need to submit this to the

7  jury or make jury -- have the jury make jury conclusions and

8  jury findings.  This is something that Your Honor and the

9  Court can decide based on the facts that are before it, and

10  particularly, in this case, because we agree on the salient

11  and most important facts which control the Geneva Conventions'

12  application of law in this matter.

13          Barring the Court having questions for me, Judge,

14  I'll --

15          THE COURT:  I don't think I do, but I would like your

16  exhibits that you've --

17          MR. DRAKE:  Yes.

18          THE COURT:  -- referred to.

19          MR. DRAKE:  And just so you all know, I've got

20  copies.

21          MR. CURRAN:  Judge, can I just show a set to the --

22          THE COURT:  Yes.

23          MR. CURRAN:  -- clients just so they know what we're

24  talking about?  Do you have a set I can just hand them?

25          MR. DRAKE:  Yeah.

1     MR. CURRAN:  Here.

2     THE COURT:  Yeah.  Why don't you hand me that.  Yeah.

3  That's for us.

4     MR. DRAKE:  Your Honor, if I may, the last exhibit in

5  there, the one with the ISIS photo -- there's a Post-it on

6  there, and there's a minor child depicted on there.  I'm not

7  intending those to be filed as an exhibit or anything like

8  that.  If the Court were inclined to refer to them or file

9  them as an exhibit, I would probably request an opportunity to

10  redact the image.  That's why I put the sticker on there.

11     THE COURT:  Okay.  That's good.

12     MR. DRAKE:  Thank you, Judge.

13     MR. SWIFT:  Addressing the most extreme the fastest

14  is the Court need worry not about somehow this becoming an

15  armed rebellion inside the United States would not constitute

16  an attack on lawful authority or treason or some part on it.

17  I'm in complete agreement with the Government part, but what

18  we need to go back to is *Palmer*, not to the --

19     THE COURT:  Hold on just a second.  Let's let

20  Mr. Curran finish talking to the clients.

21     Okay.  Go ahead.

22     MR. SWIFT:  And this needs to -- and this informs the

23  understanding of all parts on this, Your Honor, and the

24  difference on a party.  Let's go back to *Palmer*.  The United

25  States wasn't involved in the civil war in the Dutch Antilles.

1   We weren't.  There was no way for us to give status to someone

2   down in that war.  We'd have to be involved.  What the Court

3   found there was that lawful acts of war weren't triable under

4   U.S. law.  In the Civil War, we were involved, and that would

5   be a status, and that's part of the part that comes forward

6   through *Hamidullin*, that you have to give status in that part.

7   Let's understand this first third-party civil war, which falls

8   far apart on the ideas of both the Mexican *Toscano* and the

9   U.S. Civil War on how we treat -- or the original *Palmer*

10  case -- how we treat people in a civil war.  Nothing in the

11  Geneva Conventions.  Read the last line.  A party involved in

12  the conflict.  We weren't.  This isn't a party involved.

13  Syria can't be told to give -- by the United States -- to give

14  combatant immunity.  We can strongly urge it.  We can urge the

15  parts on that.  We can't require it under international law.

16  And if we were prosecuting this case under Syrian law, he'd be

17  right, but we're not.  We're prosecuting it under U.S. law,

18  and under U.S. law, in a third-party civil war recognized by

19  the Executive -- and that need be all he do is recognize the

20  existence -- then combatant immunity applies for regular acts

21  of war.  That's law.  That hasn't been changed by any part,

22  not by Geneva and not by a part, and when one reads through,

23  you have to do "Okay.  Does this apply?"  Well, we're not a

24  party.  It doesn't apply to us.

25          The most likely one is like *Toscano*, going all the

1   way back to previous international law treaties, many of which

2   remain in effect.  We'd be -- we'd be obligated to hold

3   combatants to the other side, as we did, should they stray

4   into our territory, to remain neutral.  We can't help.

5          But this is a unique situation, and that's what the

6   Court grapples with, and that's what the Magistrate Judge got

7   correctly.  *Hamidullin* was just an extension of exactly the

8   same things that had been going on in Afghanistan in these

9   questions on the part.  It wasn't groundbreaking.  And so

10  inside that part on it, we urge this Court first to consider

11  the question -- I admit in awhile, but I've explained to the

12  Court why it doesn't come up -- that combatant immunity

13  necessarily has to apply here under the long standing of it.

14         And you know what?  In all these law of war cases --

15  and I will humbly submit I've been involved in several of

16  them -- *Palmer* never came up.  *Palmer* was uncitable.  You can

17  search throughout the *Hamdan* decision or *Hamidullin*.  Why?

18  Because it factually has nothing to do with it.  And in

19  applying the situation, it wouldn't come up, and that's why

20  *Palmer* and *Toscano* apply here today.

21         A part -- the Third Geneva Conventions would not

22  require the Assad government to give nor would they require us

23  to give rebels in your own country.  That's a policy decision

24  left solely to the executive.  But when the executive has

25  recognized the state of a legitimate war, what Marshall wisely

1  said -- and it holds as true today -- and the Court doesn't

2  take sides between the combatants for lawful acts of war.  Of

3  course, war crimes, any war crime, or directly fighting for a

4  terrorist organization -- that could be charged and put forth.

5  To the extent that the Government now tries to put on factual

6  parts, we'd sit there and say we'd need a factual hearing on

7  the part because, as they say, their argument really at this

8  point lies in the fact that it's a civil war.

9       And what this Court is being asked to do is overturn

10 a case that has not been on part and a precedent in the

11 historic part of this Court, and we say if you stay with what

12 the law always was, you'll be right.  Thank you, Your Honor.

13      THE COURT:  Thank you.

14      Ms. Dragan.

15      MS. DRAGAN:  Your Honor, could I just have one moment

16 to put into perspective a little bit?  That was a lot.  I mean

17 when we initially decided to pull out this issue and both

18 parties agreed to litigate combatant immunity in advance,

19 obviously our clients believed that they have combatant

20 immunity.  The Government wanted that issue resolved.  The

21 initial motion was filed all the way back in July of 2017.

22      And I think if the Court were to agree with Judge

23 Noce that you can have combatant immunity in a non-civil -- in

24 a non-international civil war, which is his holding, and agree

25 with -- and I don't think the Government opposes -- and I'm

1   sure they'll jump up in a minute if they do -- that combatant

2   immunity is a jurisdictional issue.  If you have -- if the

3   person has combatant immunity, we're not trying them.  So if

4   we agree with Noce that there is non-international combatant

5   immunity and that combatant immunity is a jurisdictional

6   issue, it can't be a jury question.  So it is something that I

7   think that the Court either -- if you're going -- unless

8   you're going to rule for the Government, I think there

9   probably does need to be an evidentiary hearing, which is

10  where the parties kind of all thought this may go at the very

11  beginning and figure this out in advance of trial.  So I think

12  that's the only disagreement we have with Noce's ruling is if

13  you can have a combatant immunity -- combatant immunity in a

14  non-international civil war, then you can't have that as a

15  jury issue.  If they're combatant -- if they have combatant

16  immunity, they should never be tried.  So I think that that's

17  kind of where we disagreed with Judge Noce, and I just didn't

18  want all that to be lost in everything that you heard today.

19          THE COURT:  Mr. Drake.

20          MR. DRAKE:  Yes, Judge.  I'll address that very

21  briefly.  So on -- let's see here.  In the very last page of

22  Document #444, very last two pages, the Government's addressed

23  this issue.  I will tell you this.  No court has ever gotten

24  as far as -- I agree in part with what Ms. Dragan is saying

25  and I disagree in part.  No court has ever gotten this far

1     because no court has ever found that lawful combatant immunity

2     applies in this context that we're talking about.  So we

3     haven't had to make a determination of what is or is not

4     presentable to the jury.

5          Furthermore, it's called an affirmative defense, but

6     that's not how the cases have been resolved.  It's really been

7     resolved more of the way that she was speaking of initially

8     and the way that Mr. Swift has spoken of, which is if

9     combatant immunity applies, then the combatants are immune

10     from prosecution; therefore, the Government cannot prosecute

11     them.

12          And our argument in the brief, in the last pages of

13     our brief, was while we don't -- while we don't know what the

14     answer to that question is -- affirmative defense, truly

15     immune from prosecution -- we don't need to get there because

16     the facts are sufficient that you can find that combatant

17     immunity does not apply based on my earlier arguments.

18          So I respectfully disagree with Ms. Dragan that we

19     need an evidentiary hearing.  I think you have enough evidence

20     to decide, and I think it's a question of law.

21          Now, if you were to decide in some other way that

22     I've not foreseen, I guess, potentially, we would need one,

23     but we don't, as the Government, foresee that need.

24          THE COURT:  Actually, this is a question for both you

25     and Mr. Swift.  Mr. Swift, these depositions or this one

1   deposition or two depositions that you're getting ready to

2   take --

3           MR. SWIFT:  Yes.

4           THE COURT:  -- are those -- those -- are those

5   necessary to your case on the merits as well as on the --

6   they're not just limited to the combatant immunity issue;

7   right?

8           MR. SWIFT:  They are necessary also from my

9   perspective of my client because I think in the original set

10  of briefing the Government agreed that, at least as far as

11  providing support to Mr. Pazara, that he had to utilize that

12  support for fighting, that if he used the support, for

13  instance, for buying humanitarian relief aids, that that would

14  not constitute material support of murder and maiming abroad.

15          THE COURT:  Well, so my question is really not so

16  much give me your whole legal arguments and factual arguments.

17  It's more --

18          MR. SWIFT:  Yes.

19          THE COURT:  -- you're still going to want to take

20  these depositions --

21          MR. SWIFT:  Yes.

22          THE COURT:  -- even if I rule against you on this

23  combatant immunity?

24          MR. SWIFT:  Yes, although I do believe that they are

25  central to -- I would still have a defense on the part of his

1    activity, his humanitarian activities while overseas.

2         MR. DRAKE:  The Government's position is that even if

3    you were to rule against the Defendants on combatant immunity,

4    we would still join in the deposition because the defense has

5    asked for it and it might be central to whatever their factual

6    defense is at trial.  The matters that I spoke to the Court

7    about facts that we agree on are at least in part encompassed

8    on the statements from the witness that is to be deposed that

9    the defense has already taken.  In other words, what happened

10   during the first three weeks that Mr. Pazara was overseas.  So

11   the facts that could be gleaned that are relevant to this

12   proceeding, I think, we're in agreement about.

13        THE COURT:  Right.  And I thought that's what you

14   were going to say, but I just wasn't positive, so I wanted to

15   make sure I was right about that.

16        Okay.  Well, I will continue to take this under

17   submission, but I do expect to rule on it soon.  I can't say

18   when, but I hope soon.  So that's what we'll do.

19        So the Defendants are remanded to custody -- those

20   who are in custody.  The others are released on their existing

21   conditions of bond and pending your further hearing, and

22   court's in recess.

23        MR. DRAKE:  Thank you, Your Honor.

24        THE COURT:  Thank you, all.

25        (Proceedings concluded at 3:36 p.m.)

37

<u>CERTIFICATE</u>

       I, Gayle D. Madden, Registered Diplomate Reporter and
Certified Realtime Reporter, hereby certify that I am a duly
appointed Official Court Reporter of the United States
District Court for the Eastern District of Missouri.

       I further certify that the foregoing is a true and
accurate transcript of the proceedings held in the
above-entitled case and that said transcript is a true and
correct transcription of my stenographic notes.

       I further certify that this transcript contains pages
1 through 36 inclusive.

       Dated at St. Louis, Missouri, this 17th day of March,
2019.

                     */s/ Gayle D. Madden*

              _____

               GAYLE D. MADDEN, CSR, RDR, CRR

                  Official Court Reporter