**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) No. 4:15-cr-00049 CDP/DDN |
| v. | ) |
| ARMIN HARCEVIC, | ) |
| Defendant. | ) |

**DEFENDANT HARCEVIC'S OBJECTIONS TO THE PRESENTENCE**
**INVESTIGATION REPORT**

*Charles D. Swift*
Pro Hac Attorney for Armin Harcevic
Constitutional Law Center for Muslims in America
833 East Arapaho Rd., Suite 102
Richardson, TX 75081
972-914-2507
cswift@clcma.org

*Catherine McDonald*
Pro Hac Attorney for Armin Harcevic
Constitutional Law Center for Muslims in America
833 East Arapaho Rd., Suite 102
Richardson, TX 75081
972-914-2507
cmcdonald@clcma.org

*Attorneys for Defendant Armin Harcevic*

1

Defendant, **Armin Harcevic**, by and through his attorneys, **Charles D. Swift and Catherine McDonald**, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and 18 U.S.C. §3553(a), as well as the Sixth Amendment to the Constitution of the United States and the Supreme Court's opinion in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005), respectfully submits the following Objections to the Presentence Investigation Report ("PSR").

I.      INTRODUCTION

The defendant objects to numerous facts and significant omissions in the PSR as well as the calculated guidelines range and application of the terrorism enhancement. The pertinent facts related to the content of the defendant's plea have been excluded, the background of the Free Syrian Army and other groups has been excluded. It is significant that the PSR applies the terrorism enhancement in §3A1.4 without noting the defendant's continued assertion that no federal crime of terrorism could have been committed against the unrecognized forces of Bashar Al-Assad[1]. The defendant outlines the facts and background for these issues for their inclusion. Co-defendant, Jasminka Ramic's significantly lower sentence was not included in the PSR and as her conduct was similar to the defendant's, the defendant objects to the exclusion of her sentence as it is highly relevant for the purposes of avoiding disparate sentencing. Objection to the criminal history category increase to level VI is also made due to its arbitrary and unwarranted recommendation.  The political question regarding the designation of Bashar Al-Assad's forces as a valid government for

---

[1] The defense sent their Objections to the Presentence Report by letter to the Probation Services and Assistant United States Attorney on May 10th, 2019.

the purpose of classifying the defendant's crime is also outlined as an objection to the PSR's application of the terrorism enhancement. The defendant objects to the guidelines range calculated in the PSR and contends the terrorism enhancement does not apply, where it does apply, the defendant

II.     OBJECTIONS TO THE FACTS IN THE PRESENTENCE INVESTIGATION
        REPORT

   a.  Defendant believed Abdullah Pazara had joined the Free Syrian Army fighting
       Assad's forces, not ISIS.

In its description of the offense conduct, the PSR does not include the crucial facts related to the defendant's understanding of Pazara and Jasaveric having joined the Free Syrian Army (FSA) to fight Assad's forces in Syria. PSR, p. 4-9.  This was the central basis for the defendant's plea and was described in detail at his Change of Plea hearing. The defendant objects to it's absence and the resulting mischaracterization of Pazara's membership at the time of the offence conduct. Change of Plea Hearing Transcript, p.15-18. The PSR goes into great detail to provide background for the evolution of various Foreign Terrorist Organizations (FTO's), including Al-Qaida, Al-Qaida in Iraq, Al-Nusrah Front and ISIS. It however omits mention of any of the organizations that Pazara was aligned with at the time of the instant events. Instead the PSR alludes to these groups through conduct describing them as, "fighting in Syria", "committing acts of violence in Syria and Iraq", "insurgents in Syria" and other similar terms. PSR, para . 19, 22, 24, 25. In fact, until May 20, 2014, there is no direct assertion that Pazara or any of the others were fighting for ISIS. It is also quite clear that Pazara and his associate's belligerent activities were directed Assad's forces in Syria and

that at the time of the underlying offence conduct the defendant understood Pazara and his associates were associated with the FSA. Specifically, the defendant provided his monetary support to defendant Hodzic on September, 24, 2013. This was over eight months before Pazara claimed any new connection to ISIS on his Facebook page. These facts are critical for their impact on the assessment of whether a terrorism enhancement is properly applied and for these reasons the defendant objects to their absence.

As part of the defendant's objection to the ISIS-related background facts exclusively included in the PSR, the defendant proposes similar background information for the FSA and the specific units Pazara and Jasarevic actually were part of to properly and fully represent the associations the defendant intended to create.

i)    <u>Background of Abdullah Ramo Pazara and the Bosnian Unit</u>

Pazara left the United States on May 28, 2013 and arrived at the border of Turkey and Syria in July 2013. When Pazara arrived in Turkey, he had no plan to join a specific group, but he knew that he wanted to fight against the Assad regime. At the border, Pazara met another individual, Jasmin Jasaveric, who was a fellow Bosnian. They were instructed by a group called Nour al-Din al-Zenki, which was under the command of the FSA. While they received instructions from the FSA, civilians drove them in to Syria. Pazara fought directly with the FSA for the first two or three weeks. Most of the time he was stationed just to the east of Aleppo. The FSA provided Pazara and Jasaveric with clothing, food, and accommodation in houses in the city. Their duties included securing the hospital and helping the injured, no matter who they were. They would also work in the kitchens and distribute food.

After the first few weeks fighting with the FSA, Jasaveric and Pazara were placed under the command of Jaish al-Mujajireen wal-Ansar ("JMA"). Their leader in JMA was Salahuddin al-Shishani. JMA was part of a broad coalition united in fighting against the Assad regime. Most of the Bosnians in the unit expressed continued allegiance to the FSA. Both the FSA and JMA engaged in hostile activities principally against the forces of Bashar al-Assad. Both the FSA and JMA were under a chain of command with a person responsible for subordinates. Both the FSA and JMA wore military attire, akin to uniforms, and were recognizable at a distance as combatants. Both the FSA and JMA carried arms openly. Both the FSA and JMA generally complied with the laws of war and attacked Assad military targets. Further, neither the FSA nor JMA were at war with the United States, and neither the FSA nor JMA were designated FTOs when the Defendant allegedly supported Pazara. The fact that neither organization was a designated FTO is especially important regarding the lack of applicability of the terrorism enhancement and it is crucial that this be included.

Pazara remained with the same Bosnian unit from July 2013 to at least January 2014 when he joined a group called Bayt Commandos.

### III.    TOTAL OFFENCE LEVEL

Taking into account the objections set forth herein and these additional facts, the proper total offense level for Harcevic is a 25, rather than the 43 calculated by the PSR. This calculation consists of a criminal history of I, a base offense level of 26 points, plus 2 and a three-level reduction for accepting responsibility and his minor role. A total offence level of 25 combined with a criminal history category of I results in an advisory Sentencing Guidelines range of 57-71 months imprisonment without considering the § 3553 factors.

IV.     TERRORISM ENHANCEMENT

     a.   <u>The terrorism enhancement is unreasonable and irrational</u>

The defendant objects to the application of the terrorism enhancement because it is unreasonable

and unjust. This enhancement has been the subject of much scholarly debate and courts have

struggled with its application. *See* James P. McLoughlin Jr., Deconstructing United States

<u>Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for</u>

<u>Foreign Terrorist Organizations,</u> 28 Law & Ineq. 51 (2010). Available at:

<u>http://scholarship.law.umn.edu/lawineq/vol28/iss1/2</u> . *See also* <u>Punishing Terrorists: Congress,</u>

<u>The Sentencing Commission, The Guidelines, And The Courts</u>, 23 Cornell J.L. & Pub. Pol'y 517

(2014). (Attached as Exhibits A and B respectively). In *McMillan  v.  Pennsylvania*, 477 U.S. 79,

106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986), the Supreme Court implied that sometimes a higher

standard of proof beyond the preponderance of the evidence may be warranted in cases where

the sentencing enhancement in question is "a tail which wags the dog of the substantive offense."

Id. at 88. As James McLoughlin noted in deconstructing this enhancement, the enhancement is

draconian and represents the classic "tail wagging the dog" perspective.  23 Cornell J.L. & Pub.

Pol'y at 535. The Due Process Clause of the Fifth Amendment and the Trial by Jury Clause of

the Sixth Amendment requires a reasonable doubt finding after the Booker and Blakely

decisions. This is especially true because this enhancement has become, in effect, mandatory in

material support convictions. It is essentially the norm in all of these prosecutions.  *United States*

*v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011).  This enhancement essentially creates a separate

offense, an offense that requires a separate finding of intent – specifically that Harcevic's actions

were "calculated" to influence the conduct of government.  This – of all enhancements – must be what the Supreme Court envisioned in McMillan when it talked about the "tail which wags the dog of the substantive offense."  Here, where the enhancement raises the range from 57-71 months up to 360 months, the government should have to prove to this Court at sentencing that the terrorism enhancement applies beyond a reasonable doubt.  The government cannot meet this burden. Even if the Court does not grant this objection, the Court should conclude that the enhancement is inherently flawed, and refuse to apply it in this case. After Kimbrough, this Court is free to openly disagree and give this enhancement little or no weight.  As noted by John McLoughlin, there was not much empirical data on terrorism sentences when the Sentencing Commission promulgated it. 23 Cornell J.L. & Pub. Pol'y at 537.

> b. <u>The terrorism enhancement's criminal history category increase to level VI is arbitrary and unwarranted</u>

The defendant objects to the PSR's calculation of a criminal history category VI as that is arbitrary and unwarranted. Section 3A1.4's automatic application of Criminal History Category VI is difficult to reconcile with the structure and purpose of the sentencing guidelines. The Sentencing Commission "fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007). Thus, "in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id*. The terrorism enhancement is not the ordinary case. It is backed by no empirical evidence, and it's automatic application of a 12-level increase and Criminal History Category VI, without regard to the facts in any particular case, is arbitrary.

The Sentencing Commission classifies defendants by Criminal History Category because courts must endeavor to impose a sentence that will "protect the public from further crimes of the defendant" (18 U.S.C. § 3553(a)), and "repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation." U.S.S.G. § 4A1.1, Introductory Comment. The terrorism enhancement however unnecessarily increases the criminal history category.  Senior Judge George O'Toole, Jr., presiding over *United States v. Mehanna* gave a strong criticism of the guidelines, ultimately rejecting them and sentencing Mr. Mehanna within the range that would have applied without them. "Both the 12-level adjustment to the offense level and the automatic assignment of Criminal History Category VI, . . . regardless of any facts, not only make the recommendation unuseful as a guide in a particular case but is actually, in my view, contrary to and subversive of the mission of the Guidelines which is to address with some particularity the unique facts of a given case." Sentencing Transcript, *United States v. Mehanna*, CR 09-10017 GAO (D. Ma.)(Docket 430), 7-8. Judge O'Toole specifically called out the automatic application of Criminal History Category VI as "too blunt an instrument to have any genuine analytical value" and "fundamentally at odds with the design of the Guidelines" because it "imputes a fiction into the calculus." *Id.* at 8-9. *See also United States v. Jumaev*, 2018 WL 3490886, \*10, CR 12-0033 JLK (D. Colo. July 18, 2018) (refusing to apply the enhancement because "is not backed by any empirical evidence" and because "treating all 'terrorists' alike is impermissible under our sentencing paradigm").

In *United States v. Alhaggagi*, 2019 U.S. Dist. LEXIS 37889, \*16, 2019 WL 1102991 (N.D. Cal. March 8, 2019), Judge Charles R. Breyer agreed with the assessment of the enhancement's treatment of criminal history being unjust, stating,

8

"…the enhancement's treatment of criminal history-automatically assigning to all terrorism defendants a criminal history category of VI- is inappropriate based on the seriousness of the crime, inappropriate based on assumptions about recidivism, and inappropriate as to this Defendant, warranting a downward departure".

In that case, the defendant was convicted of providing material support to a designated terrorist organization through online social networks. After outlining the process that district courts must go through to calculate the appropriate guideline range, Judge Breyer cites *George D. Brown*, Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014), "the terrorism enhancement takes a wrecking ball to this carefully constructed edifice." Noting that the terrorism enhancement increases both the defendant's offense level as well as increases their criminal history to the highest possible level, the Court presumed the reasoning for this unusual enhancement was to reflect the seriousness of crimes of terrorism. Judge Breyer disagrees with this use of the enhancement nothing that "it is the offense level that reflects the seriousness of a charged offense." *Alhaggagi* ((citing *United States v. Martinez*, 931 F.2d 851, 852 n.1 (11th Cir. 1991) ("The total offense level 'reflects the seriousness of the offense of conviction adjusted for relevant conduct'"). The Court further noted that "a defendant's criminal history category reflects something different." *Alhaggagi* (citing *Martinez,* 931 F.2d at 852 n.1, "the distinction between the calculation of the offense level and the calculation of the criminal history category is important insofar as 'each calculation concerns a conceptually separate notion related to sentencing.'") The Court concludes "if terrorism sentences are too low, the Sentencing Commission can recommend increasing the offense level for those crimes. But automatically increasing a defendant's criminal history to reflect the seriousness of the charged offense is

inappropriate, as it does not reflect—unlike every other offense—the seriousness of the defendant's previous criminal convictions." *Alhaggagi* at *18. Lastly, the Court stated that "the terrorism enhancement's treatment of criminal history flies in the face of fair, individualized sentencing, and is inappropriate as to this Defendant." *Alhaggagi* at *22-23. The Court cited Judge O'Toole Jr.'s observation in the Transcript of Disposition (dkt. 439) at 69*, United States v. Mehanna,* No. 09-10017-AO (D. Mass. 2012):

> "Moreover, the automatic assignment of a defendant to a Criminal History Category VI is not only too blunt an instrument to have genuine analytical value, it is fundamentally at odds with the design of the Guidelines. It can, as it does in this case, import a fiction into the calculus. It would impute to a defendant who has had no criminal history a fictional history of the highest level of seriousness. It's one thing to adjust the offense level upward to signify the seriousness of the offense. It is entirely another to say that a defendant has a history of criminal activity that he does not, in fact, have."

The terrorism enhancement's arbitrary increase of the criminal history category is unwarranted especially in Harcevic's case. He is not a career criminal. He is not violent. He is not a repeat offender and is not the highest level of criminal possible. The defendant has a criminal history of one, related to a contracting without a license conviction from 2005. PSR at para. 59. Absent the terrorism enhancement his criminal history category would be two. Fortunately, U.S.S.G. § 4A1.3(b)(1) provides: "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a

downward departure may be warranted." As the Court's have now begun to acknowledge and criticize the arbitrary and unjust criminal history increase, and the defendant's conduct and personal history do not indicate any reasons for an increase, the defendant objects to the PSR's computation of a criminal history category of VI. PSR, para. 62. Indeed a departure from the Guidelines and enhancement are necessary here to reach a fair, individualized sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. See 18 USC § 3553.

     c.   <u>Should the Court find the terrorism enhancement reasonable, it should not find it applicable under our facts as there was no 'federal crime of terrorism'</u>

In its version of the offense, the government seeks the terrorism enhancement for both counts.  Probation has determined that the terrorism enhancement applies to both offenses as they have been grouped together under U.S.S.G. § 3D1.2(b).  It is the defense position that the terrorism enhancement does not apply at all for a very simple reason. Harcevic's offenses both relate to providing support to fighters targeting Assad forces. The FSA and the Balkan unit that Pazara was part of were there to retaliate against the brutal and unrecognized regime of Bashar Al-Assad. At a time that the entire world was watching and condemning the brutality of Assad's forces, the FSA fought them and gained support for this retaliation. However, it is important to note that this support was not, as the terrorism enhancement requires, "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. §2332b(g)(5)(A).

U.S.S.G. §3A1.4 provides for a 12 level increase in the offense level, and automatic placement in criminal history category VI if a defendant's "offense is a felony that involved

or was intended to promote a federal crime of terrorism."  According to Application Note 1, a

"federal crime of terrorism" is given the same definition as used in 18 U.S.C. §2332b(g)(5).

18 U.S.C. §2332b(g)(5) provides a two pronged definition for a "federal crime of terrorism."

To qualify as a federal crime of terrorism an offense must be a violation of any one of a list

of enumerated statutes found in 18 U.S.C. §2332b(g)(5)(B).  A federal crime of terrorism

must also be an offense that is "calculated to influence or affect the conduct of government

by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C.

§2332b(g)(5)(A).  It is this provision that is at issue here.  In determining whether the

terrorism enhancement applies, the burden is on the government to show by a preponderance

of the evidence that Harcevic had the "specific intent" to commit an offense that was

"calculated to influence or affect the conduct of government by intimidation or coercion, or

to retaliate against government conduct."  *United States v. Awan*, 607 F.3d 306, 317 (2nd Cir.

2010) citing 18 U.S.C. 2332b(g)(5)(A); cf. *United States v. Noble,* 246 F.3d 946, 953 (7th

Cir. 2001), *United States v. Starks*, 309 F.3d 1017, 1026 (7th Cir. 2002), *United States v.

Johnson*, 227 F.3d 807, 813 (7th Cir. 2000) ("During sentencing, the Government must prove

the facts underlying the base offense or an enhancement by a preponderance of the

evidence.").

    The Second Circuit considered this issue in *United States v. Stewart*, 590 F.3d 93, 137,

2009 U.S. App. LEXIS 28595, *117 (2d Cir. N.Y. November 17, 2009) when assessing

whether a defendant convicted of the same charge as the defendant had committed a federal

crime of terrorism, specifically whether his conduct was calculated to influence or affect the

conduct of government. The district court did not apply the enhancement because it noted

that the Fourth Circuit recognized that commission of a federal crime of terrorism included a

"specific intent requirement, namely that the underlying felony was 'calculated to influence or affect the conduct of government by  intimidation or coercion, or to retaliate against government conduct." *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008). The Court concluded that because there was no evidence that the defendant himself sought to influence or affect the conduct of a government the enhancement did not apply and after calculating the defendant's Guidelines range to be 78-97 months, sentenced him to 20 months with a downward variance with the Second Circuit Court of Appeals upheld. Similarly here, the government has not provided any evidence to show that Bashar Al-Assad's forces constituted a valid government, in fact they cannot as public statements by the President and Secretary of State stated otherwise. As explained herein, Harcevic's offense of conviction relates solely to the support of the FSA fighting Assad's forces, an illegitimate government. This is not addressed in the PSR and the defendant objects to its exclusion.

 

     d.  <u>Bashar Al-Assad's forces certainly did not constitute a lawful government, raising a political question for the Court and eliminating any possibility of the defendant promoting a 'federal crime of terrorism'</u>

 

Outlined here are the pertinent facts regarding Syrian leadership and statehood at the time of the offense for inclusion in the PSR. Civil unrest began in Syria in February 2011. In July 2011, seven officers defected from the Assad military and announced the formation of the FSA. The FSA declared that Assad's "security forces attacking civilians are from now on justified targets to be neutralized by FSA." In 2011, the FSA became a well-organized fighting force with a command structure and sophisticated weaponry. On October 2, 2011, rebel groups formed the Syrian National Council ("SNC") in Istanbul, Turkey.  In April

2012, over 100 countries, including the United States, recognized the SNC as "the umbrella organization under which Syrian opposition groups are gathering" and as "a legitimate representative of the Syrian people." On June 12, 2012, the United Nations officially recognized that there was a civil war in Syria. On July 23, 2012, the United States Office of Foreign Assets Control ("OFAC") granted a United States nonprofit organization, the Syrian Support Group, Inc. ("SSG"), a license to support the FSA.

On August 20, 2012, President Obama issued a warning to the Assad regime against using chemical weapons. He stated that any use of chemical weapons by Assad would change the United States' "calculus." If Assad used such weapons, he would cross a "red line" and be "held accountable by the international community." On October 31, 2012, Secretary of State Hillary Clinton announced that the United States no longer considered the SNC "the visible leader of the opposition." She called for an even broader opposition coalition that would fully represent "those who are in the frontlines, fighting and dying today to obtain their freedom." In November 2012, a broad coalition of Syrian opposition groups signed an agreement in Doha, Qatar, creating the National Coalition of Syrian Revolutionary and Opposition Forces ("SOC"). The SOC was "left open to all hues of the Syrian opposition" and "agreed to bring down the regime and all its symbols and mainstays." The group included "the Supreme Military Council representing the Free Syrian Army."

On December 11, 2012, the President of the United States recognized this broad opposition group as "the legitimate representative of the Syrian people." On December 12, 2012, the Department of State confirmed that it was the United States' policy to regard the SOC as "the legitimate representative of the Syrian people." Then, in June 2013, President Obama publicly authorized his administration to provide arms to rebels fighting against

Assad.  On September 10, 2013, President Obama formally acknowledged that the Syrian conflict had become a civil war "[o]ver the past two years."

There is no question that Harcevic's support of Pazara was with calculated intent to affect and retaliate against Assad's forces. But in this case that is not the end of this consideration because Assad's forces no longer retained the status of a lawful government. At the time of Harcevic's offense conduct, the President of the United States had stated that he recognized the broad opposition group of the SOC as the legitimate representative of the Syrian people and had stated the United States no longer recognized Assad. Consequently, the terrorism enhancement cannot apply because it was not influencing a government recognized by the United States. Under these circumstances judicially applying the terrorism enhancement would be contrary to the political question doctrine which requires courts to defer to other branches of government on questions left exclusively to them. That is particularly true here.

"The Executive is institutionally well-positioned to understand the foreign policy ramifications of the court's resolution of a potential political question. Accordingly, an Executive Branch opinion regarding these ramifications is owed deference, no matter what form it takes." *Al-Tamimi v. Adelson*, 916 F.3d 1, 13 (D.C. Cir. 2019) citing *Hwang Geum Joo v. Japan*, 413 F.3d 45, 52, 367 U.S. App. D.C. 45 (D.C. Cir. 2005). Since the President did not consider Assad's forces to be a legitimate government, the court cannot bestow lawful government interests upon them. Absent a governmental interest there is no federal crime of terrorism and therefore the terrorism enhancement cannot apply.  For these reasons the defendant objects to any application of the terrorism enhancement in calculating the sentencing range.

V.    ROLE IN THE OFFENSE AND DISPARATE SENTENCING OF CO-
      DEFENDANT WITH SIMILAR CONDUCT

        a.    <u>Mitigating Role in the Offenses</u>

    The Presentence Investigation Report "PSR" grants no reduction in offense level under

U.S.S.G. §3B1.2 (Mitigating Role) for the combined counts. PSR, para. 41. Though the PSR

clearly notes that co-defendant's Hodzic and Rosic "are most culpable as Ramiz was the

primary organizer of the conspiracy and Rosic's goal was to go overseas and participate in

the terroristic activity". The PSR then notes that co-defendant's "Sedina Unkic Hodzic and

Mediha Medy Salkicevic are next in culpability ad they recruited individuals to provide

support to the conspiracy". PSR, para. 41. Harcevic is treated as one of the least culpable

along with Jasminka Ramic. The only real difference in their conduct is the amount of money

provided, $1,500 versus $700. For the PSR to recognize the significant difference in roles of

the co-defendants and acknowledge Harcevic's lesser culpability and then decline to

recommend a reduction for his role is unwarranted and amounts to a dismissal of §3B1.2.

When compared to the conduct of the other co-defendants, Harcevic's conduct is

substantially less serious, he was not one of the "managers, organizers and leaders". To

determine if his role would make a minor or minimal reduction appropriate his conduct must

be compared to that of the average participant to determine if he is "substantially less

culpable." U.S.S.G. §3B1.2.  The PSR acknowledges Harcevic is clearly substantially less

culpable than the average participant and so 2-3 points should be deducted for his minor role.

PSR, para. 41.

b.  Disparate sentencing of co-defendant Jasminka Ramic

As discussed above, co-defendant Ramic shared a lesser culpable role with Harcevic amounting to very similar conduct. In fashioning an appropriate sentence, judges are directed by statute to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C.S. § 3553(a)(6). Jasminka Ramic's conduct and cooperation that the court assessed warranted 36 months imprisonment followed by 3 years of probation is considerably lower than the recommended guidelines range and does not include a terrorism enhancement. There is no reason, no additional conduct or lack of cooperation that could justify the court treating Harcevic any differently. In *United States v. Reyes-Santiago*, 804 F.3d 453, 456 (1st Cir. 2015), the court found sentencing disparities between equally high-level members of a conspiracy to distribute various drugs was substantively unreasonable under 18 U.S.C.S. § 3553(a)(6)  because the rationale for the substantial disparity between the defendant's sentence and sentences of defendants above him was not supported by the record. Here, there is nothing in the record to support a significant disparity from Jasminka Ramic's  sentence even if she plead to a lesser charge as the conduct was similar and arose out of the same circumstances.

VI.     CONCLUSION

For the reasons set forth above, the defendant objects to the numerous exclusions of relevant facts, to the application of the terrorism enhancement and the failure to account for his mitigating role in the offence.

Respectfully submitted,

*s/ Charles D. Swift*

Charles D. Swift, Pro Hac Attorney for the Defendant, Armin Harcevic

*s/ Catherine McDonald*

Catherine McDonald, Pro Hac Attorney for the Defendant, Armin Harcevic

**Constitutional Law Center for Muslims in America**
833 East Arapaho Rd., Suite 102
Richardson, TX 75081
972-914-2507
www.clcma.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17st day of May, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*|s| Charles D. Swift*
Chares D. Swift
*Pro Hac for Armin Harcevic*

18