UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15 CR 00049 CDP/DDN |
| | ) | |
| ARMIN HARCEVIC, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' SENTENCING MEMORANDUM AND
RESPONSE TO DEFENDANT'S OBJECTIONS**

Comes now the United States of America, by and through its attorneys, Jeffrey B. Jensen, United States Attorney for the Eastern District of Missouri, and Matthew T. Drake, Howard Marcus, and Kenneth Tihen, Assistant United States Attorneys for said District, and Joshua Champagne, Trial Attorney for the United States Department of Justice, National Security Division, Counterterrorism Section, and submit the following Response to Defendant Harcevic's Objections to the Presentence Report prepared by the United States Probation. The Government states as follows:

I.    **Procedural History**

On February 5, 2015, criminal proceedings were initiated against Defendant Armin Harcevic ("Harcevic"). By way of an Indictment, Harcevic was charged in two counts for violations of Title 18, United States Code, Section 2339A; one count for conspiracy to provide

1

material support in furtherance of specified law violations, and a second count for a substantive violation of the Section 2339A.

On February 25, 2019, Harcevic pled guilty.  The parties had no plea agreement and no agreed upon factual basis for the plea.  Instead the Defendant pled open to the Court and provided his own factual basis for the plea.

## II.     <u>Defendant's Objections</u>

The Defendant asserts two primary factual objections to the Presentence Report ("PSR"). First, he claims the PSR excluded "the background of the Free Syrian Army ["FSA"] and other groups."  The Defendant argues that Pazara affiliated himself with the FSA.  Inasmuch, the Defendant argues his support of Pazara should not implicate the victim related adjustment enhancement in § 3A1.4 because (1) "no federal crime of terrorism could have been committed against the unrecognized forces of Bashar Al-Assad," and (2) the United States' support of the FSA negates application of the enhancement.  The Defendant also argues that co-defendant Jasminka Ramic's sentence was not included in the PSR, and he should be entitled to a mitigating role in the offense adjustment.

In this memorandum the Government will outline facts to address each of these objections. The Government will also address relevant law on the issue of the United States Sentencing Guidelines ("U.S.S.G.") Chapter Three adjustments.

## III.     <u>Factual Background of the Terrorist Organizations: al-Qa'ida in Iraq/Islamic State of Iraq and al-Sham ("AQI/ISIS")</u>

On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al Jihad, as a Foreign Terrorist Organization

("FTO") under Section 219 of the Immigration and Nationality Act ("INA") and as a Specially Designated Global Terrorist ("SDGT") under Section l(b) of Executive Order ("E.O.") 13224.

As early as 2005, a person known by many names and referenced herein as Abu Bakr al-Baghdadi ("al-Baghdadi") was identified as a senior AQI leader.  In furthering the goal of establishing a caliphate in the region, AQI's leadership declared the Islamic State of Iraq ("ISI"), under which AQI claims its attacks.  The AQI-led ISI was created with Iraqi-national Abu Umar al-Baghdadi named its leader.  Umar al-Baghdadi and AQI's other top leader, Abu Ayyub al-Masri, were killed in April 2010.  AQI subsequently named Abu Bakr al-Baghdadi as the head of ISI.  AQI, acting through its front organization ISI, was highly active in 2010, perpetrating almost daily attacks on Iraqi civilian targets and military assets.  Many of these attacks had significant casualty counts.  In all, ISI either claimed responsibility for, or was suspected of, being responsible for almost 350 attacks inside Iraq in 2010.  On October 7, 2011, the U.S. Department of State ("DOS") designated al-Baghdadi as an SDGT. 76 Fed. Reg. 62,494 (Oct. 7, 2011).

Al-Nusrah operated as an alias of AQI.  The group was created in January 2012.  The group was predominant in Syria and was largely made up of mujahedeen fighters aiming to overthrow the Syrian government.  Al-Nusrah has a goal of establishing an Islamic state in the region.  Al-Nusrah has claimed hundreds of suicide, firearms, and improvised explosive device attacks.  AQI has publicly declared its affiliation with al-Nusrah.  AQI and al-Nusrah hold to ideological extremist views which seek to establish an Islamic state through violence.

The DOS designations were amended in 2012 to include additional aliases of AQI: Al-Nusrah Front, Jabhat al-Nusrah, and Al-Nusrah Front for the People of the Levant. 77 Fed. Reg.

73,732 (Dec. 11, 2012).  In January 2012, the 2004 designation of AQI as an FTO under Section 219 of the INA was amended to include "Islamic State of Iraq" as an alias of AQI. 77 Fed. Reg. 4082 (Jan. 26, 2012).  On or about December 12, 2012, the DOS issued a statement in which it amended the FTO and E.O. 13224 designations of AQI:

> to include the following new aliases: al-Nusrah Front, Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant. The Department of State previously designated AQI as an FTO under the Immigration and Nationality Act and as a Specially Designated Global Terrorist under E.O. 13224 on October 15, 2004. The consequences of adding al-Nusrah Front as a new alias for AQI include a prohibition against knowingly providing, or attempting or conspiring to provide, material support or resources to, or engaging in transactions with, al-Nusrah Front . . .

Press Release, Victoria Nuland, Dep't of State, Terrorist Designations of the al-Nusrah Front as an Alias for al-Qa'ida in Iraq (Dec. 11, 2012), https://2009-2017.state.gov/r/pa/prs/ps/2012/12/201759.htm.

In 2013, al-Baghdadi released a statement describing the history of AQI and announcing that the organization was changing its name to the Islamic State of Iraq and the Levant, merging his Iraqi and Syrian forces with Jabhat al Nusra under Islamic State of Iraq and the Levant. Christopher M. Blanchard & Carla E. Humud, *The Islamic State and U.S. Policy*, Cong. Res. Serv. 13 (Sept. 25, 2018). According to linguists, "Levant" has a number of generally accepted meanings, including "al Sham" and "Syria."  Thus, in English language sources, the name of the group is variously understood as the Islamic State of Iraq and the Levant ("ISIL"), Islamic State of Iraq and Syria, or the Islamic State of Iraq and al Sham (both "ISIS").  ISIL/ISIS are referred to in the Bosnian language as "Islamska Drzava Iraka i Shama" ("IDIS").

The support, leadership, and affiliations among al-Qa'ida, AQI, al-Nusrah, ISIL and other related groups regularly changed and evolved. Further, the Syrian conflict was also a constantly changing, emerging, and evolving environment. AQI and its aliases ISIL/ISIS are supported by a variety of insurgent fighters. Nevertheless, AQI and its aliases al-Nusrah, ISIL/ISIS engaged in violence and terrorism. Knowingly providing support to the group in furtherance of such activities is prohibited.

On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the INA and as an SDGT entity under Section 1(b) of E.O. 13224 to add the alias Islamic State of Iraq and the Levant as its primary name. The Secretary also added the following aliases to the ISIL listing:

> the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. 79 Fed. Reg. 27,972 (May 15, 2014). Although the group has never called itself AQI, this name has frequently been used to describe it through its history.

To date, AQI/ISIS remains a designated FTO.

Frequently, individuals who have traveled to Syria and Iraq to join AQI/ISIS have entered Syria by crossing the border from Turkey. Foreign fighters travelled to locations in Turkey, including Istanbul, and then to towns close to the border with Syria where they are led or smuggled into Syria to join the terrorist group. AQI/ISIS published guidebooks containing tactics, techniques and procedures for its supporters to allow them to evade official scrutiny and potential arrest should they attempt to travel to Syria and Iraq. One technique was to avoid flying directly to Syria or Iraq, as well as to Turkey because its border with Syria was known as a successful

crossing point for numerous ISIL recruits.  AQI/ISIS also recommended that foreign recruits present themselves as tourists or to use a recommended "cover story" to avoid official scrutiny.

Beginning no later than 2014, using social media, AQI/ISIS called for attacks against citizens—civilian and military—of the countries participating in the United States-led coalition against AQI/ISIS.  For instance, on September 21, 2014, AQI/ISIS released a speech of Abu Muhammed Al-Adnani, a senior leader and official spokesman.  In this speech, entitled, "Indeed Your Lord is Ever Watchful,'' Al-Adnani called on Muslims who support AQI/ISIS from around the world to "defend the Islamic State" and to "rise and defend your state from your place where you may be."  Using social media, AQI/ISIS encouraged individuals to kill specific persons within the United States.  In 2015 alone, AQI/ISIS also claimed the following: the burning of a Jordanian airman, the attacks in Paris, France and the downing of a Russian commercial airplane.

**IV.**  **Factual Response to Defendant's Objections to the Presentence Report**

    **A.**  **Abdullah Ramo Pazara Affiliated and Aligned with AQI/ISIS, not the Free Syrian Army**

The Defendant claims that when Abdullah Ramo Pazara ("Pazara") arrived in Syria he joined and fought with the Free Syrian Army ("FSA"), not AQI/ISIS.   He further claims that Pazara remained with the same unit from July 2013 to at least January 2014.  Defendant cites to an interview with an unindicted co-conspirator, Jasmine Jasarevic ("Jasarevic"), for support that Pazara fought for the FSA.  However, these claims are not supported by statements Jasarevic made during his interview with Agents, (Def. Exhibit F) or by the evidence generally.

In his interview, Jasarevic said nothing about him or Pazara joining FSA.  What Jasarevic actually said was that he and Pazara got to Syria and joined the fighting in July 2013.  "[H]e

6

[Jasarevic] was "asked to join FSA at the first house he stayed at [in Syria].  There were different units within FSA at the time and they were listed by house" but he "didn't choose any unit." Def. Exhibit F p. 5–6.  Jasarevic said nothing about who Pazara fighting for or with or whether Pazara was joining the FSA.  Rather, Jasarevic said that "RAMO [Pazara] joined fifteen-twenty days after the others.  There was a misunderstanding among the Bosnian Foreign Fighters and RAMO left to join the Chechens where he had a 'better time' meaning there was more fighting at the frontlines." He said nothing about Pazara affiliating himself with the FSA.  Later, Jasarevic said that Pazara "joined JAMWA or ISIL with the rest of RAMO's [Pazara] house." [1] Def. Exhibit F, p. 6-7. Jasarevic also said that, "RAMO [Pazara] had acquired an M-84 machine gun and complained that they weren't doing enough military actions.  When he joined ISIL, they were doing more actions and RAMO was satisfied.  Whenever the groups split is when RAMO joined ISIL."  Def. Exhibit F, p. 7.  At best Jasarevic said that Pazara was in the same area or building with individuals affiliated with the FSA for two to three weeks starting in July 2013.  After those initial three weeks, Jasarevic, who was one of Pazara's co-conspirators, acknowledged that Pazara joined AQI/ISIS rather than the FSA.

Contrary to the Defendant's assertions, overwhelming evidence demonstrates that Pazara affiliated himself with organizations other than the FSA including most prominently AQI/ISIS.

---

[1] JAMWA is short for Jaish al-Muhajireen wal-Ansar a/k/a the Muhajireen Battalion which is a Salafi jihadist group that was active in the Syrian Civil War against the Syrian government.  JAMWA was designated as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224 on September 24, 2014.

During a Facebook messenger conversation between Jasarevic [2] and Pazara on January 4, 2014, Pazara asked, "I heard the brothers are being martyred."  Jasarevic responded, "Peace, brother. We are dealing with a situation in waging war against the FSA [Free Syrian Army].  They want to attack us. . . The situation is fierce. We cannot go back to Haritan." [3]  Gov. Exhibit 1, Trans 2953.  Two days later, on January 6, 2014, Ramiz Hodzic had a Facebook conversation with another of Pazara's conspirators who was fighting with Pazara in Syria, a person identified as "M.K."  Ramiz asked whether M.K. knew "WHAT IS GOING ON WITH ABDULLAH [Pazara]?"  M.K. replied that he was "alright." Gov. Exhibit 1, Trans 3282.  Ramiz also asked, "are there enough of you? Can you hold your own against those freemen [Free Syrian Army]?"  M.K. responded, "There are tens of thousands of us, thank God. We are destroying them . . . In one place we killed 30 of them." Gov. Exhibit 1, Trans 3283.

Even early in the conspiracy the defendants knew, and Pazara explicitly stated, that Pazara was not with the FSA.  Rather, Pazara was with and supported terrorist organizations.  For example, on August 1, 2013, co-defendants Ramiz Hodzic and Mediha Salkicevic had conversation over Facebook messenger.  Ramiz Hodzic told Salkicevic that the Bosnians and specifically one from Teslic, Bosnia—referring to Pazara—who were in Syria needed boots and uniforms.  Salkicevic agreed to help and asked Ramiz Hodzic how much was needed. Gov. Exhibit 2, Trans. 238.  Ramiz Hodzic replied that they could give as much as they could and they would soon ship packages.  Salkicevic asked how shipments to Syria and retail functioned during

---

[2] This is the same Jasmine Jasarevic identified in Def. Exhibit F

[3] Haritan is a town in northern Syria.

wartime.  Gov. Exhibit 2, at 242.  Ramiz Hodzic stated that he could ship them through a contact in Turkey to an individual from St. Louis who was in Syria fighting, who he later identified as Pazara.  Gov. Exhibit 2, at 242.  Ramiz Hodzic sent Salkicevic a photo of Pazara, Gov. Exhibit 2, Trans 250, and identified him as the person from St. Louis fighting in Syria.  Gov. Exhibit 2, Trans 246.  The photo depicted Pazara in a black cap with Arabic script, pointing a semi-automatic pistol in the air. Gov. Exhibit 2, Trans 250. Salkicevic expressed joy about hearing that Pazara responded to the call for jihad.  Gov. Exhibit 2, Trans. 251. Ramiz Hodzic told her that there were "about 150 from Bosnia . . . [and o]urs are mainly with the *Chechens in the brigade* [emphasis added]." Gov. Exhibit 2, Trans 256.  This is consistent with Jasarevic's statements that Pazara initially fought with the Chechens, not with the FSA.

Pazara explicitly identified himself as affiliated with and fighting for AQI/ISIS on August 14, 2013, in an email exchange with co-conspirator Jasminka Ramic.  In an email, Ramic asked whether Pazara was in one of the following brigades: "Akhrar al Sham, Jabhat al Nusra,[4] Ahmad Assaf, Fajr Islam or Salahuddin Ayyubi." Gov. Exhibit 3, Trans. 3421.  The following day, August 15, 2013, Pazara replied and stated that "[a]ll of the brigades have united into one and the Islamic Country of Iraq and Sham (Syria) [ISIS] has been established." Gov. Exhibit 3, Trans 3421

Throughout August and mid-September 2013, Pazara regularly updated his Facebook page and posted various links, news articles, and commentary evidencing his affiliation with and support for AQI/ISIS.  For example, on August 22, 2013, Pazara posted a news article titled "Amazing Mujahideen Training SYRIA - Jihad Training Camp in Sham [Syria]—Al Qaeda Mujahideen in

---

[4] Jabhat al Nusra is a designated foreign terrorist organization

Syria 2013.""  Gov. Exhibit 4, Trans. 3763.  He also posted a link to a YouTube video titled

"ISLAMIC STATE OF AIRAQ AND SHAM – NASHEED." Gov. Exhibit 4, p 1082.  The same

day he posted an image on his Facebook page.  The image depicted a fighter dressed in black in

front of a black flag of jihad.  The image read: "AL QAEDA COMING SOON TO EGYPT." Gov.

Exhibit 4 p. 1348.

On September 4, 2013, Pazara posted a link that stated:

THE ISLAMIC STATE OF SHAM AND IRAQ WAS ESTABLISHED. ALLAH IS THE GREATEST! THANKS TO ALLAH! FOR THREE YEARS, THEY'VE BEEN KILLING MUSLIMS, RAPING MUSLIM WOMEN, KILLING CHILDREN, AND THE ENTIRE WORLD HAS BEEN WATCHING IT PEACEFULLY.  NOW THAT THE MUJAHIDEEN HAVE BEEN STRENGTHENED AND THE ISLAMIC STATE HAS BEEN ESTABLISHED BY ALLAH'S WILL, THE UNBELIEVERS HAVE GATHERED TO EXTINGUISH THE LIGHT OF ALLAH BUT THEY WON'T BE ABLE DO IT, I SWEAR TO ALLAH! MUJAHIDEEN ARE ONLY AFRAID OF ALLAH AND WE PROSTRATE ONLY TO HIM, ALLAH IS THE GREATEST! MARTYDOM OR VICTORY, ALLAH IS THE GREATEST! [5]

Gov. Exhibit 5, Trans. 2638 - 2639.

On September 17, 2013, Pazara posted that "70 000 mujahideen are fighting in Syria. The

return of the Caliphate is inevitable!"[6] Gov. Exhibit 5, Trans 2637.   The following day Pazara

posted that "[y]esterday 09.17, mujahid of the Islamic State in Iraq and Sham (ISIS) carried out a

martyrdom operation on a communist guerrilla commander from Kurdistan Workers' Party (PKK)

_____

[5] Posts made or written by Pazara and others frequently contain grammatical and typographic errors.  In this document the posts have been quoted as they were originally posted.

[6] A caliphate is an Islamic state under the leadership of a follower of Islam with the title of caliph. Abu Bakr al-Baghdadi is the leader of ISIS and proclaimed the Caliphate.

in Hasakah, where he killed at least 65 traitors . . . ." The title of the post was "Syria: at least 85

Kurds have been eliminated in attacks by ISIS Mujahideen."  Gov. Exhibit 5, Trans 2636.[7]

On September 18, 2013, Pazara updated his Facebook page and posted:

Yesterday, September 17th, mujahedeen of the Islamic State in Iraq and Sham (ISIS) conducted a [UI] operation against the headquarters of the communist guerillas from the Kurdistan Workers Party (PKK) in Al Hasakah, where at least 65 people were killed... As a result of attacks by the mujahedeen of ISIS, at least 85 Kurds were eliminated. . . Reminder that not too long ago the mujahedeen killed the president of the so-called Assad's government for the Hama province, Arias Abdul-Razzaq Nacre. According to the latest information, the mujahedeen were very successful.

Gov. Exhibit 5, Trans. 2636.

To show his specific dislike and opposition to the FSA, on September 19, 2013, Pazara

updated his Facebook page and liked a post that stated:

The group associated with al-Qaida after the fierce battle took control of town Azaz from the Free Syrian Army. The conflict in Azaz was the most difficult one since the tensions between the rebels factions in Syria began to rise. Armed conflicts broke out in northern Syria between various anti-government forces, it was reported by agencies . . . *The Freedom Army group in Azaz is the worst group which denial the truth about the faith in Islam* and devoting it . . . the briefly it is a criminal clan that was visited by a US diplomat directly . . . we can understand why there is an overwhelming noise and complains of the unbelievers . . . .

Gov. Exhibit 5, Trans 2634 – 2635

---

[7] The PKK is short for the Kurdistan Workers' Party (Kurdish: Partiya Karkerên Kurdistanê[a]).  It is a militant and political organization based in Turkey and Iraq.  Since 1984 the PKK has been involved in an armed conflict with the Turkish state, with the initial aim of achieving an independent Kurdish state, later changing it to a demand for equal rights and Kurdish autonomy in Turkey.

Pazara also posted, "Mujahideen of the Islamic State of Iraq and Sham today, Wednesday, occupied the town of Azaz located 5km from the Syrian Turkish border, Reuter's indicates referring to the activists. Then, in the continuation of the text, it was added that in the attack of the mujahideen five fighters of the Freedom Army were killed and about a hundred were arrested. . . ." Gov. Exhibit 5, Trans 2634.

On September 18, 2013, Pazara updated his Facebook status with a post that stated:

A map of the current situation in Syria, in accordance to the request of our visitors to publish a map that is showing how much of the Syrian territory is under the control of the Free Army of Syria, Jabhat al-Nusra and the Islamic State of Iraq and Sham, and how much of the territory is held by the criminal regime of Bashar al-Assad. . .,,.

Gov. Exhibit 5, Trans. 2636.

Pazara also said that many FSA fighters left the FSA and joined groups such as AQI/ISIS, which Pazara supported. On September 21, 2013, Pazara posted:

Thousands fighters of Freedom Army have crossed to the side of jihadist groups, a move that has been described as a shock to the "moderate" rebels. Activists and military sources told Al-Jazeera that the entire 11 division—one of the largest brigades of the Free Syrian Army took the side . . . THEY TOOK THE SIDE OF THE MUJAHIDEEN TO FIGHT THAT WORD OF ALLAH IS GREATER ! !

Gov. Exhibit 5, Trans 2633.

That same day, Pazara posted, "60 enemy soldiers were killed and eliminated, 70 were wounded, 14 were captured, and 100 pieces of weapons were seized, while pursuit for the rampant enemy have continued. In the offensive of Khalid ibn Walid, which lasted throughout the entire day

yesterday, in the attack and then pursuit and persecution . . . ." [8] Gov. Exhibit 5, Trans 2632. Following that, Pazara, on September 22, 2013, posted "According to the latest information, hundreds of Syrian rebels that they have recently claimed to be moderate, they now move to al-Qaida related organizations: al-Nusra Front, ISIL (Islamic State of Iraq and Levant)." Gov. Exhibit 5, Trans 2631 - 2632.

Pazara continued his affiliation with ISIS throughout his time in Syria.  On October 2, 2013, Pazara posted, "Syrian mujahideen, including the Al-Qaeda branch, have occupied a military station on the border with Jordan after four days of fighting, report the activists." Gov. Exhibit 5, Trans 2645.  On October 3, 2013, Pazara posted:

> IRAQ: ISIS mujahideen brought down a military helicopter in the north part of the state. . . militants have brought down a military helicopter in northern Iraq on Wednesday, killing all four crew members, police sources said, Reuter reported. The helicopter carried out a security mission between the city of Kirkuk and the province of Salahuddin early in the morning when it came under heavy fire . . .

Gov. Exhibit 5, Trans 2643 - 2644.

The following day, on October 4, 2013, Pazara posted a link on Facebook that stated: "Mujahedeen took over the control the Alevian village of Kfernan in Homs after the car bomb attack on the checkpoint and the fierce battles with Assad's forces. In the battles that lasted until the evening, 30 men from the national defense were killed . . . ."."  Gov. Exhibit 5 Trans 2643.

The next day, on October 5, 2013, Pazara posted a picture of seven individual including himself.  The image depicted Pazara [third from the right] and his six of his co-conspirators and

---

[8] Khalid ibn al-Walid was an armed group active in Syria and affiliated with the Islamic State of Iraq and the Levant.

fellow fighters wearing the gear and clothing that the defendants sent to Pazara and the other

fighters in Syria. Gov. Exhibit 5, Trans 2658.  The title stated: "Bosnian lions . . . . . . ALLAH IS

THE GREATEST!!!"  The caption title read:

> THE ISLAMIC STATE OF IRAQ AND SHAM is a state of Muslims. It is a sharia
> state built on the foundations of self-sacrificing people on the path of Allah but still,
> as such, it is a nuisance to every disbeliever and hypocrite, as well as to Muslims
> who do not understand Satan's intrigues and traps!!! O ISLAMIC STATE ALLAH
> IS SUFFICIENT FOR YOU!!!

> Gov. Exhibit 5, Trans 2659

He reposted the image the same day and wrote in the title "In the hands of the bride of death. In

their chests is courage. They are gentle towards Muslims and SEVERE towards disbelievers . . . .

A part of the mujahideen from the Balkans in Sham [Syria]"  Gov. Exhibit 5, Trans 2646.  Another

image posted on Pazara's Facebook page on the same day depicted a soldier donating or receiving

blood.  The caption read, "FIGHTERS OF THE ISLAMIC STATE OF IRAQ AND SHAM HELP

ISLAM AND MUSLIMS IN EVERY POSSIBLE WAY!!!"  Gov. Exhibit 5, Trans 2649.

From November 17 to 22, 2013, Ramiz Hodzic had a Facebook conversation with one of

Pazara's co-conspirators identified as "A.S."  In the conversation, A.S. confirmed that he and

Pazara's group were with ISIS.  Ramiz Hodzic asked whether A.S. was "close to the brothers

Abdullah and [M]."  Gov. Exhibit 6, Trans 873.  A.S. replied that he was "in the same group with

[M].  He lives 100 to 200 meters from me. . ." and that Abdullah Pazara was "the tall one." Gov.

Exhibit 6, Trans 873.  Ramiz later asked how the brothers were doing and A.S. replied, "We are

awaiting on weapons from Dawla." [9] Gov. Exhibit 6, Trans 881.  On November 26, 2013, A.S.

---

[9]  Dawla is short for "Dawlat Irak al-Sham," i.e., the Bosnian spelling of ISIS/ISIL.

told Ramiz Hodzic that he "got a rifle. The scope [that Ramiz Hodzic sent to A.S.] will perfectly fit for it." Ramiz Hodzic replied, "ay Allah make it precise and strengthen you so that you destroy as many non-believers as possible." Gov. Exhibit 6, Trans 883.

On January 6, 2014, Ramiz Hodzic had a Facebook conversation with "M.K." Ramiz Hodzic asked M.K "WHAT WAS GOING ON WITH ABDULLAH [PAZARA]?" Gov. Exhibit 6, Trans 3282. M.K. replied that Pazara was "alright." Ramiz Hodzic asked whether it calmed down and M.K. replied it has not. Gov. Exhibit 6, Trans 3282  Ramiz Hodzic asked whether "there are enough of you? Can you hold your own against those freemen [Free Syrian Army]?" Gov. Exhibit 6, Trans 3283. M.K. replied "There are tens of thousands of us, thank God. We are destroying them. In one place yesterday, we killed 30 of them." Gov. Exhibit 6, Trans. 3283. Ramiz said he "pray[s] to Allah to grant [M.K.] a victory." Gov. Exhibit 6, Trans 3283. He continued they were under siege. Gov. Exhibit 6, Trans 3284.

In sum, Pazara firmly affiliated himself with AQI and ISIS. He spread their propaganda, reposted news reports about the organizations, received weapons from them, and fought alongside other persons in the organizations. He openly and proudly identified himself as an ISIS fighter and jihadist.  There is no evidence that Pazara and his conspirators allied themselves with the FSA, the contrary is true. They fought against the FSA. Even read in a light most favorable to the defense interpretation of Jasarevic's interview, Jasarevic told investigators that he and Pazara were around FSA personnel for two to three weeks in July.  The Defendant's support for Pazara began in late September 2013 and continued through at least May 2014.  The facts show that during that entire time Pazara and his conspirators were aligned, affiliated, and fighting for AQI/ISIS.

B.      Defendant Harcevic's Role in the Offense

1.      Factual Background on Defendant Harcevic's Role

The Defendant argues he should receive a reduction for his role in the offense.  Harcevic should not be entitled to a minor or minimal role in the offense because it is not supported by the evidence.  Other than Salkicevic, Harcevic was the co-defendant who contributed the most money to Pazara's conspiracy abroad.   From September 2013 through May 2014, Harcevic gave Ramiz Hodzic at least $2,000.00 for Pazara and his fellow fighters in Syria.  Furthermore, as detailed below, co-defendant Ramiz Hodzic characterized Harcevic as one of the most important contributors because he was "the only one to answer the call right away." Gov. Exhibit 7, Trans. 747.

On August 25, 2013, Harcevic had a conversation with co-defendant Ramiz Hodzic via Facebook messenger.   Ramiz Hodzic told Harcevic, he wanted to convey regards from the brothers, e.g., Pazara. Gov. Exhibit 7, Trans 745.  He told Harcevic that they "WENT ON AN OFFENSIVE THIS MORNING.   THEY WILL BE GONE FOR SEVERAL DAYS."   Gov. Exhibit 7, Trans 746.  Harcevic replied and offered his blessings.  Ramiz stated, "They asked me how people react when I say that money is being collected for them. I told them how you were the only one to answer the call right away."   Harcevic responded, "Brother, that's our duty." Gov. Exhibit 7, Trans 747.  Ramiz Hodzic and Harcevic went on to discuss the materials and packages that Ramiz Hodzic shipped to Pazara and the other fighters including "anything from socks to binoculars went, thank God. Ten pairs of uniforms, 10 pairs of boots, 30 pairs of socks, 21 pairs of gloves, belts, masks for sand, and something else that I can't remember. Big binoculars." Gov.

Exhibit 7, Trans. 749.  Harcevic replied, "May Allah reward you, brother!"  Ramiz continued, "There are 25 of our [guys] in the platoon." Gov. Exhibit 7, Trans. 749.  Ramiz then sent Harcevic a series of links to photographs of the various materials he sent to Pazara and asked if Harcevic saw them.  Harcevic replied, "I opened the one with the boots." [10] Gov. Exhibit 7, Trans. 751–754.

On August 25, 2013, Ramiz Hodzic continued his conversation with Harcevic and said that "they start a new offensive today.  Our guys are in the frontline.  Pray Allah to make it easier for them." Gov. Exhibit 7, Trans. 759.  Continuing the conversation, on September 15, 2013, Harcevic asked Ramiz Hodzic "Did the package arrive?" Gov. Exhibit 7, Trans. 763 and Ramiz Hodzic replied that he thought it was "already with him [Pazara]" and that he was "going to send some money today." Gov. Exhibit 7, Trans. 764.  A few days later Harcevic asked whether "the brothers g[o]t the clothing" and Ramiz Hodzic told him that they "[t]hey took it" and he "sent them money so they will get back tomorrow."  Gov. Exhibit 7, Trans. 770.  In response Harcevic told Ramiz Hodzic "Send 1,500 from me if you have it.  I will give it to you when I come down there, God willing. . . I can transfer it to the bank account"  Gov. Exhibit 7, Trans 771 -773.

These conversations were the background for Harcevic's wire transfer of $1,500.00 to Ramiz Hodzic on September 24, 2013.  This is the material support that Defendant Harcevic admitted to sending during his plea colloquy.  The following day, Ramiz Hodzic sent additional money via Western Union to Pazara and others in Syria.  In summary, from September 17 to 24, 2013, Ramiz Hodzic sent Pazara $1,850.00.

---

[10] Harcevic became Facebook "Friends" with Pazara on 12-16-12.  Gov. Exhibit 7 Trans 581.

On September 24, 2013, Ramiz Hodzic had a Facebook conversation with Pazara and told Pazara that Salkicevic a/k/a Bosna Mexico gave $100.00 and Sedina Hodzic gave $50.00.  Gov. Exhibit 8, Trans. 485.  Ramiz Hodzic stated that he sent it yesterday. Exhibit 8, Trans. 485.  Ramiz Hodzic told Pazara that he was waiting for money to be sent to his account so that he could transfer another $1,000.00 to $1,500.00 to Pazara. Exhibit 8, Trans. 485.  Ramiz Hodzic wrote that he "posted a status that they only have two days for those who wants to send it directly and *only* Armin and Bosna Mexico replied." Exhibit 8, Trans. 486 (emphasis added).  He indicated "[t]hat 1,500.00 is going to be from Armin and I pray to Allah to honor him with paradise and dress him up in the clothing of a martyr on Judgment day!" Exhibit 8, Trans. 486.  Ramiz Hodzic added that Pazara should pray for Armin because, "[t]*hat man is fighting financially with all his might*" for Pazara. Exhibit 8, Trans. 487

Following up on their providing support to Pazara, from October 2 to 3, 2013, Ramiz Hodzic had a conversation with Pazara over Facebook and confirmed that Pazara and his conspirators got the money transfers, the shipments, and that all the gear and clothes fit.  Exhibit 8 Trans 492. Pazara said there were fifteen in his group at the time and they "were on the [front] line." Exhibit 8, Trans 496, 507.  Ramiz Hodzic told Pazara that a brother told him "about the pickup, but it is hard. I can only count on Armin, and I have these 8 new tires. If I sell them I will send that to you [Pazara] also, around 2,500.00."  Exhibit 8 Trans 508. Ramiz Hodzic continued, "I cannot even explain to you how much brother Armin is for you all!" Exhibit 8 Trans 509.  Pazara replied, "Armin is a real brother." Ramiz Hodzic replied, "I swear to Allah, I have not seen someone fight with more financial might than him [Harcevic]." Exhibit 8, Trans 510.

2.    Defendant Harcevic Played a Different Role than Co-Defendant Jasminka
Ramic

The Defendant argues "Jasminka Ramic's conduct and cooperation that the court assessed

warranted 36 months imprisonment followed by 3 years of [supervised release] is considerably

lower than the recommended guidelines range and does not include a terrorism enhancement."

Def. Obj. p 17.   Parts of this statement have no support in the record and parts are wholly

inaccurate.   In Ramic's case this Court adopted the PSR findings of fact, conclusions of law, and

guidelines calculations as its own.   In that adoption, this Court found and applied the Victim

Related Adjustment of U.S.S.G. Section 3A1.4.

Defendant Harcevic argues that:

The only real difference in their [Harcevic and Ramic] conduct is the amount of
money provided, $1,500 [Harcevic] versus $700 [Ramic]. For the PSR to recognize
the significant difference in roles of the co-defendants and acknowledge Harcevic's
lesser culpability and then decline to recommend a reduction for his role is
unwarranted and amounts to a dismissal of §3B1.2.

While it is true Defendant Harcevic gave more than twice amount of money to further the

conspiracy, and over a longer period of time than Defendant Ramic, this objection is flawed.

There are numerous distinguishing factors between Defendants Ramic and Harcevic's

circumstances that warranted the sentence and judgment this Court ordered.   First, Harcevic gave

a total of at least $2000.00 from September 2013 through May 2014.   Second, as this Court is

aware, Defendant Ramic was convicted of one count of violating 18 U.S.C. § 371 (Conspiracy to

Commit Offenses Against the United States).   Defendant Harcevic pled guilty to two counts of

violating 18 U.S.C. § 2339A (providing material support in furtherance of a conspiracy to violate

18 U.S.C. § 956).   Second, as this Court also found from Defendant Ramic's PSR there were

19

personal, individualized circumstances concerning Defendant Ramic's background that are not similarly present for Defendant Harcevic.  Third, in Defendant Ramic's case the defense argued for a four level reduction pursuant to U.S.S.G. § 3B1.2(a).  The Government did not object.  At sentencing, this Court found that Defendant Ramic was a minimal participant in criminal activity and therefore, decreased the Guidelines range by four levels.

While Defendant Harcevic is correct that he is less culpable than co-defendants Ramiz Hodzic and Nihad Rosic, that does not mean he is entitled to a role in the offense reduction pursuant to U.S.S.G. § 3B1.2.

C.   Facts Supporting the Conclusion that Defendant Harcevic's Offenses Were Calculated to Influence or Affect the Conduct of Government by Intimidation or Coercion, or to Retaliate Against Government Conduct

The offenses here were calculated to retaliate against and influence the Syrian government, and also the governments of Turkey, Iraq, the United States, and other nations.

From November 21 to 28, 2013, Pazara had a Facebook conversation with an individual identified as "Person E."  In the conversation Pazara and Person E stated:

11-21-13
Person E:      if islam is a religion of peace and the greater jihad is the spiritual one in your heart, why do you cloth yourself and your facebook in violent images? the war did not come to you, you moved to syria to be closer to the war. Abdullah ur heart was made for gentleness and love for your brothers and sister, please commit your hands to rebuilding lives in syria and do not commit your hands to violence that will destroy others lives. [sic][11]

11-28-13
Pazara:       Listen !!!!! I Can not sit home while American soldiers (Dogs) and all other enemy of Islam are killing my brothers and sisters Muslim's, America and

---

[11] The writers of these citations occasionally used all capital letters.  For ease of reading some of those capitals have been reduced to lower case.

20

all other Cristian's countrys are in the war with Islam!!1  They are trying to hide that!! But thanks to Allah he open my heart so I can see what kind of game are enemy of Islam is doing !!! I am a soldier of Allah now!! And I will fight for Islam till end!! Government in Siarya is Kuffar , Enemy of Islam and Muslim's, and they fill go down in sha Allah !!! Why don't you talk how they are killing Muslims everywhere ?????? Only a begining of a great jihad !!!! Allahu Ekber , Islam will rule the warld in shaAllah. Siryan Govrment dog's are killing Muslim on a same way that ortodox Serb's did to Bosnian Muslims !!!! They will go down and they will be punished!!!!

Gov. Exhibit 9, p. 3808-3809.

Later, on December 08, 2013 Pazara wrote to Person E and said:

THAT PRESIDENT [President Obama] IS TERORIST HE IS KILLING MUSLIM'S EVERYWHERE !!!. . . THAT PRESIDENT (DOG) IS KILLING MUSLIM'S EVERYWHERE AND HE IS TELLING LIKE HE IS FIGHTING TERRORIST LIER!!!! HE IS DOING THE SAME THING THAT BUSH (DOG) DID, BUT THEY WILL BE JUDGE BY ALLAH AND I ASK ALLAH THAT HE THROW THEM IN THE DEEP HELL [SIC]

Gov. Exhibit 9, p. 3811-3812.

On February 24, 2014 Pazara wrote to Person E and stated:

american troops ocupied afganistan, iraq palestina wit help of jews, america is number 1 enemy of ISLAM AND RETURN OF THE HALAFET [CALIPHATE] ( DO YOU KNOW WHAT IS THE HILAFET ?? ) AND AMERICANS ARE WORKING SO HARD TO PUT DEMOCRACY IN TO SYRIA BUT WE WANT SHARIALAW !!! THEY DON'T HAVE TROOPS ON JET BUT THEY ARE WORKING ON THAT, AND SEE WHAT THEY AMERICAN TROOPS AING IN IRAQ AFGHANISTAN !!!! [SIC]

Gov. Exhibit 9, p. 3815.

He continued on February 27, 2014, telling E.F., "ACCEPT ISLAM AND COME TO JIHAD . . . I AM FIGHTING FOR ALLAH , SO WE CAN ESTABLISH ISLAMIC STATE SHARIA LAW AND HILAFAH.". Gov. Exhibit 9, p. 3818.

21

From March 11 to 15, 2014, Pazara wrote to Person E and explicitly stated that he
was retaliating and attempting to retaliate against the United States and a host of Nations.

On March 11, Pazara wrote:

> 3-11-14
> Pazara:      i though the cristians in usa they are peace lovers , but i see they
> drop bombs on muslim civilians kids and wommen, and they want to occupy
> muslim countrys , !!! how come that hapend ??? AND IN THE NEWS THEY SAY
> WE FIUGHT TERRORIZM !! WHAT A LIERS !!! AMERICA RUSIA CHINA
> EURPOE EVRYBODY WILL FALL DOWN !! BECOSE THE TIME OF ISLAM
> IS COMING BACK MY FRIEND !!! CHILLOUT AND WATCH.  [SIC]

> Gov. Exhibit 9, p. 3821.


Their conversation continued:

> 3-14-14
> Person E:      Wow i used to play a video game that was just like that video. Who
> was that in the video? Was it the idis ? [ISIS]

> Pazara:        the shooter was ISLAMIC STATE OF IRAQ AND SHAM
> MUJAHEDEEN , AND THE SOLDIERS WHO GOT KILLED WHERE USA
> ARMY DOG'S!! I ASKED YOU A QUESTION HOW THE USA LOST THE
> WAR IN AFGANISTAN ?? WHAT HAPEND??

> Gov. Exhibit 9, p. 3822.

On March 15, Paraza confirmed his relationship with ISIS.

> 3-15-14
> Pazara:        yes I am with mujahedeen ISLAMIC STATE IRAQ AND SHAM.
> WE FIGHT FOR ISLAMIC STATE BASED ON THE KU'RAN AND SUNNET
> AND WE WANT TO BRING BACK HILFAH [CALIPHATE] IN SHA ALLAH
> BY ALLAH WILL.

> Gov. Exhibit 9, p 3823.

On March 22, 2014, Pazara shared one of ISIS's photos on his open, i.e., public, Facebook page and stated "This is what it looks when the MUJAHEDEEN OF ISLAMIC STATE OF IRAQ AND *SHAM* and the PKK (COMMUNISTS FROM SYRIA) see each other, one will stay with ISIS."  Gov. Exhibit 10, Trans. 3460. Pazara also shared ISIS photos and videos and posted: "BOOTY, THANK GOD, FROM THE LAST ACTION. ALLAH SUPPLIES HIS MUJAHEDEEN." Gov. Exhibit 10, Trans 3460

On April 22, 2014, Pazara again wrote to Person E about his retaliation against the United States.  He stated:

> defensive i right know, example usa attacked afganistan iraq somalia and other playsis , so now we are doing defensive jihad, AFTER THIS WHEN WE BREAK USA ARMY AND OTHER ONCE WHO ARE HELPING USA, WE WILL GO TO OFENSIVE JIHAD, WE WILL COME TO USA IN SHA ALLAH TO MAKE IT ISLAMIC STATE !!!

Gov. Exhibit 9, p. 3835 - 3836.

Following up on his conversation from March 22, 2014, concerning fighting with Turkish PKK soldiers, on May 7, 2014, Pazara's posted a series of approximately seven photographs on his open, i.e., public, Facebook page. Gov. Exhibit 10, p. 1312–1325.  The graphic images depicted individuals who were killed and lying on the ground in green clothes.  The caption for the series of photographs read:

> THE INFIDLES OF PKK WHO, WITH THE HELP OF ALLAH, WE KILLED IN THE LAST ACTION, THANK GOD, ARE FIGHTING AGAINST THE ISLAMIC STATE AND ALLAH'S LAW.  HERE IS WHAT AWAITS THEM ON THE TEMPORAL WORLD; INFIDELS IN TRENCHES, KILLED LYING DOWN.  ONES ARE LYING DOWN OTHERS ARE RUNNING AWAY HOME. Gov. Exhibit 10, p. 1312–1325.

23

On May 14, 2014, ISIS was designated by the DOS as the replacement alias and name for AQI.  Gov. Exhibit 11.

On May 16, 2014, Ramiz Hodzic and Harcevic had a conversation.  Hodzic said he was collecting more money for Pazara and he would put in $200.00 for Harcevic. Gov. Exhibit 12, Trans 1098. After a discussion Harcevic said "put three hundred again, uh, in my name . . . if you can." Gov. Exhibit 12, Trans 1099-1100.  Ramiz and Harcevic discussed that part of the money would be for travel to see a wounded brother who lost his hand in combat.  Gov. Exhibit 12, Trans 1098–99. Ramiz Hodzic told Harcevic that Pazara only had $5, and Harcevic replied that he would contribute $500.00 for Pazara and the brothers. Gov. Exhibit 12, Trans 1100. Ramiz Hodzic replied that with Harcevic's money he would send $1,500.00 to Pazara and the brothers.  Gov. Exhibit 12, Trans 1100.  Thereafter, from May 20 to June 14, 2014, Ramiz Hodzic transferred $1,470 to Pazara, which included the $500 Hodzic received from Defendant Harcevic.

In addition to retaliating against United States and Turkish interests, Pazara and members of his conspiracy also retaliated or attempted to influence the Iraqi government.  On June 13, 2014, Pazara posted a picture of himself with a large firearm.  Ramiz Hodzic posted the image to his open, i.e., public, Facebook page, Gov. Exhibit 13, Trans. 1964 - 1965, and commented, "Good thing that you finally got your hands on a rifle that isn't small for you!!!"  Gov. Exhibit 13, Trans. 1964–1963.

Later that same day, Ramiz Hodzic had a Facebook conversation with Pazara.  During the conversation Ramiz Hodzic asked whose "sniper" was "that" and Pazara replied that brothers from Chechnya captured it.  Ramiz Hodzic replied it was a good one.  Ramiz Hodzic then asked whether

they captured it in Iraq and Pazara replied, "from FSA dogs."  Gov. Exhibit 13, Trans 1967  Pazara
stated that anti-aircraft machine gun bullets go into it and Ramiz Hodzic asked whether it was 14.5
or 14.7.  Gov. Exhibit 13, Trans 1968.  Pazara replied 12.7.  Ramiz Hodzic stated that "our"
Browning automatic rifle was 12.7 and Pazara replied that this one "destroys."  Pazara said that he
had boots given to him as a gift and that the boots are silent and good for "quite [presumably,
quiet] liquidations."   Ramiz Hodzic asked whether Pazara knew how to make a quick and
cheap silencer for "quite liquidations."  Gov. Exhibit 13, Trans 1969. Pazara replied that they made
them, but they still could be heard.  Ramiz Hodzic stated that he would send new footwear sneakers
to Pazara.  Ramiz Hodzic added that fuel (oil) filters made good silencers and they could be grafted
to the rifle.  Pazara replied that they tried, and it still made noise.  Pazara stated that they have
everything and that Allah gave them all.  Ramiz Hodzic asks what shoe size Pazara was Gov.
Exhibit 13, Trans  1970.

On June 14, 2014, Pazara posted a series of pictures on his Facebook page.  The images
included a Humvee, a tank. Gov. Exhibit 13, Trans 1982 - 1983, and Pazara standing with a co-
conspirator fighter. Exhibit 13, Trans 1984–85.  There was also an image of a helicopter with a
caption that states "ISIS air strike on Maliki [former Prime Minister of Iraq] forces."  Pazara also
"liked" a Facebook a militarytimes.com article that stated: *How did 800 ISIS fighters rout 2 Iraqi
divisions?*

Also on June 14, 2014, Person E and Pazara had a discussion via Facebook with Person E:

Pazara:       ISLAMIC STATE IRAQ AND SHAM ,,,,,,, HILAFAH IS
              COMING SOON IN SHA ALLAH !!!!!!!!

Gov. Exhibit 9 STL 18293. [Pazara sent Person E a photograph depicting a bomb mushroom cloud with the caption "ISIS war cup 1435 In baghdad soon"

Person E:      Are you planning to go to Iraq soon?

Pazara:        I AM IN IRAQ !!!!!!!!!!!!!

Person E:      What!!! when did you leave Syria?

Pazara:        2 WEEKS AGO. . . . we control half sirya and almost iraq total hahaha THANKS TO ALLAH ALMIGHTY

Person E:       heard on the news that insurgents were taking over Iraq

Pazara:        WE ARE TAKING IRAQ OVER FROM KUFAR SHIA!!!!! ISLAMIC STATE OF IRAQ AND SHAM IS EVERY DAY BIGER AND BIGER ALLAHU EKBER. . . WE ARE BRINGING HILAFAH BACK !!!!!!!!!!  CALIPHATE DO   YOU   NOW WHAT IS CALIPHATE ???

Gov. Exhibit 9, STL 18293-18295

On June 14, 2014, Ramiz Hodzic had a telephonic conversation with Harcevic.  Ramiz Hodzic asked whether Harcevic saw a photo that was posted in the morning where "Shishani got an armored truck and Bosnians, who are under the command of Abdullah Pazara . . . got a tank." Gov. Exhibit 14, Trans. 3023. Harcevic confirmed he had.[12]  Ramiz said there were many of them and they were not able to take all of the Hummers. Gov. Exhibit 14, Trans 3024.  They had to burn it so that nothing was left behind. Harcevic replied that Al-Nusrah was entering and "they, uh, are really fighting for Baghdad." Gov. Exhibit 14, Trans 3024   Ramiz Hodzic stated that "Chechens,

---

[12] Omar Shishani was the military commander for all of ISIS until his death.  See also Def.  Exhibit F p.7

who fly helicopters—it seems that they shot at Maliki."[13] Gov. Exhibit 14, Trans 3025. Ramiz Hodzic stated that he would see Harcevic and "H." tomorrow. Gov. Exhibit 14, Trans 3025.

On June 16, 2014, approximately nine new photographs were posted on Pazara's open, i.e., public, Facebook page. Gov. Exhibit, 13 Trans 1982–1992. The images depicted Pazara and another male. One image showed Pazara and another man dressed in tactical camouflage clothing, standing in front of an armored Humvee vehicle and a tank. Gov. Exhibit 13, Trans 1984–85. Other photos posted on the same date and series depict two tanks. The caption of the series of photos read, "BOSNIAN MUJAHIDS OF SHAM GOT American HUMMERS from Mosul [Iraq] THANK GOD!" Gov. Exhibit 13, Trans 1988. The comments on the images indicate that the conspirators were engaged in and benefitting from combat that occurred in Iraq.

On June 24, 2014, Pazara updated his Facebook "status," translated as follows:

We are Terrorists because Terror is (intimidation of enemies) a requirement described in ALLAH's book. Let the East and the West know, we are TERRORISTS, and that they need to fear us !!! THE EXALTED ALLAH SAYS IN THE QURAN: "And against them prepare as many forces and hoses as you can for battle so that you can to TERRORIZE Allah's and your enemies" (Sura Al-Anfal, verse 60). SUCH TERROR is described in ALLAH'S RELIGION. THANK GOD.

Gov. Exhibit 13, Trans 2008.

On August 22, 2014, Pazara sent Person E a Facebook message. The message contained a video attachment. The video depicted a speech by President Obama as well as the full video depicting the beheading of United States journalist Nick Foley. Gov. Exhibit 9, STL 18295–18296.

---

[13] This is a reference to Nouri Kamil Mohammed Hasan al-Maliki, the Iraqi politician who was Prime Minister of Iraq from 2006 to 2014

On September 3, 2014, Person E had a Facebook conversation with Pazara.   The
conversation stated in pertinent part:

| | |
|---|---|
| Person E: | goodmorning/afternoon i saw your post on my wall...very cute do you like that video that you sent me? |
| Pazara: | Which one?? |
| Person E: | the disgusting beheading of the journalist |
| Pazara: | I LOVE IT !!!!!. . .  [J.] he was happy killing muslims in afganistan iraq ...... this is punishment for him in this world . I ask ALLAH TO THROW HIM IN A DEEP JAHENEM (HELL FIRE)) |
| Person E: | i hear they are going to behead another journalist. |
| Pazara: | We Did !!!!!  He was a soldier of usa !!!!! Not journalist you Dirty liers !!!!!!  And he was a spy !!!!!! |
| Person E: | oh man.  were you at these beheadings? |
| Pazara: | Yes |
| Person E: | Ha! liar. how were you there if you were in Iraq!!!!!! 2nd you didnt put 14 explanation points behind the Yes!!!!!!!!!!  why do you lie to me abdullah? is it because i am a dirty kuffar???  i suppose that was you wearing the black mask. sigh. i am reading koran but u make it difficult on my spirit. think about that abdullah |
| Pazara: | What did I lie to you ??? |
| Person E: | You really were there!??? |
| Pazara: | Think about what ???? [E.]!!! America and their alies are killing inosent muslims everywhere for a long time !!! They will be deafited soon . Seat back and watch !!! Defeated '' |
| Person E: | i understand and i and watching what was the journalist like. ?? |
| Pazara: | He look like PIG . . . I would like to behead gorge bush the last president !!!! |

28

Gov. Exhibit 9, STL 17916 - 17917.

Following up on that conversation, on August 26, 2014, Pazara posted an image on his Facebook page.  The first image depicted a mock-up photo of President Obama on his knees in orange prisoner's clothes being held by a masked fighter as if in a beheading. Gov. Exhibit 15, STL 18187. The comment stated "Coming soon from Islamic State."  He also posted an image depicting a map of the of the Earth , and the ISIS flag spread over numerous nations in the Middle East, Arabian peninsula and Syria. Gov. Exhibit 15, STL 18184.  Pazara posted a third graphic image on his Facebook page on September 9, 2014.  It depicted a number of world political leaders from various states, including President Obama, and a fighter beheading a prisoner. Gov. Exhibit STL 18188.

In summary, the facts demonstrate that Pazara and his conspirators, both individually and as a members of various terrorist organizations, engaged in activities that were calculated to influence or affect the conduct of multiple governments by intimidation or coercion, or to retaliate against government conduct.

**V.      United States Sentencing Guidelines Victim Related Adjustment – Section 3A1.4**

A.      Elements and Overview

United States Sentencing Guidelines ("U.S.S.G.") Section 3A1.4 is categorized under chapter three as a victim related adjustment for terrorism.

Section 3A1.4 states, in pertinent part, that:

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

The terrorism sentencing enhancement requires that the "offense is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a). The sentencing enhancement does not require that the offense itself be a federal crime of terrorism, but rather that the offense, "involved, or was intended to promote" a federal crime of terrorism.

A "federal crime of terrorism" is defined by cross-reference to 18 U.S.C. § 2332b(g)(5). U.S.S.G. § 3A1.4(a), app. note 1. Federal crime of terrorism has two elements: (1) the defendant must have been convicted of violating a statute enumerated at 18 U.S.C. § 2332b(g)(5)(B); and (2) the offense must have been, "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A). A violation of a statute enumerated in 18 U.S.C. § 2332b(g)(5)(B) is not a federal crime of terrorism if the offense was not "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). *See infra* discussion of the meaning of "government."

The terrorism enhancement may apply even if a defendant's actions were remote from physical violence or the defendant lacked the means and the ability to carry out an ultimate terroristic act. *See United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) (the court held that the "defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation" is not determinative); *United States v. Wells*, 163 F.3d 889, 899 (4th Cir. 1998). The enhancement may apply irrespective of whether the defendant's conduct risked or caused death or carried a substantial risk of injury. *United States v. Dowell*, 430 F.3d 1100

30

(10th Cir. 2005); *United States v. Thurston*, No. CR 06-60069-01-AA et al., 2007 WL 1500176 (D. Or. May 21, 2007).  The enhancement does not require that the offense involve violence. *United States v. Ali*, 799 F.3d 1008, 1014 (8th Cir. 2015) (enhancement applied to provision of material support in the form of funds to an FTO, Al Shabaab); *United States v. Assi*, 586 F. Supp. 2d 841, 843 (E.D. Mich. 2008), *affirmed*, 428 Fed. App'x. 570 (6th Cir. 2011) (enhancement applied to provision of material support in the form of "global positioning satellite modules, night vision goggles, and a thermal imaging camera" to an FTO, Hizballah).

"[T]the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Stewart*, 590 F.3d 93, 143 (2nd Cir. 2009) (citing *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir.), *cert. denied*, 538 U.S. 1068, 123 S. Ct. 2240 (2003)).[14]

B.    The Meaning of "Government" in 18 U.S.C. § 2332b(g)(5)(A)

---

[14] Application Note 4 of § 3A1.4 contemplates an upward departure (as opposed to application of § 3A1.4 itself) where "the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  U.S.S.G. Section 3A1.4 cmt. n.4 (2009).  In this case, the Court need not consider Application Note 4, because as discussed below the application of § 3A1.4 is so clearly appropriate.  Viewed in the aggregate, the enhancement itself and the potential for upward departure in "near-miss" cases reflect an understanding that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and difficulty of deterring and rehabilitating the criminal, and thus, terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).

The "government" being influenced, affected, or retaliated against need not be the United States federal government.  The Eighth Circuit applied the enhancement where the defendants' "offenses were calculated to influence or affect" the Transitional Federal Government of Somalia "by intimidation or coercion or to retaliate against the government." *United States v. Ali*, 799 F.3d 1008, 1032 (8th Cir. 2015) (discussing the defendant's "vocal support of al Shabaab's efforts to expel the TFG by force, and their fundraising efforts in support of that cause").

Likewise, the Fifth Circuit found that a Colombian terrorist group's attempt to influence Colombia met the enhancement criteria. *See United States v. DeAmaris*, 406 F. Supp. 2d 748, 750 (S.D. Tex. 2005) (asserting "the most reasoned approach to defining the word 'government' as used in § 2332b(g)(5)(A) is to define 'government' as including any government, foreign or domestic, and not to limit it to the United States government"); *United States v. Puerta*, 249 Fed. App'x 359, 360 (5th Cir. 2007) (finding no plain error where the enhancement is applied attempting to influence or affect the conduct of the Colombian government, rather than the U.S. government).

The Sixth Circuit found that a Hizballah supporter's attempts to influence Israel met the criteria as well. *United States v. Assi*, 586 F. Supp. 2d 841, 849 (E.D. Mich. 2008) (asserting the defendant's course of conduct was calculated to influence or affect the conduct of the Israeli government); *see also United States v. Assi*, 428 Fed. App'x 570, 574 (6th Cir. 2011) (finding that "the term 'government' in 18 U.S.C. § 2332b(g)(5) includes foreign governments").

 In addition, the Second Circuit applied the enhancement to a scheme designed to influence to Egyptian government. *United States v. Stewart*, 597 F.3d 514 (2d Cir. 2010), *affirmed*, 686 F.3d

32

156, 162 (2d Cir. 2012) (applying the enhancement to a lawyer who smuggled messages between an imprisoned defendant she was purportedly representing and third parties that related to an Egyptian militant group, al-Gama'a, and "its violent efforts to overthrow the Egyptian government."). Finally, the Middle District of Florida applied § 3A1.4 to defendant whose goal was to overthrow secular governments and impose Sharia law as evidenced by information recovered from his computer. *United States v. Bell*, 81 F. Supp. 3d 1301, 1312 (M.D. Fla. 2015).

Further, the enhancement may apply to conduct that was merely intended to intimate or coerce a state or local government and not the federal government. *See United States v. Harris*, 434 F.3d 767, 773 (5th Cir. 2005) (applying the terrorism enhancement to the destruction of a municipal building housing the local police station); *see also United States v. Thurston*, No. CR 06-60069-01-AA et al., 2007 U.S. Dist. LEXIS 38185, at *50 (D. Or. May 21, 2007) (finding the "plain language of the statute does not identify a specific form or level of government" and that "all forms of government are included in the broad sweep of the phrase"); *United States v. Tubbs*, 290 F. App'x 66, 68 (9th Cir. 2008) (affirming the application of the enhancement to defendants who were convicted of conspiracy to commit arson and the destruction of an energy facility).

Whether the government in question has acted contrary to international law is not a factor in determining whether that government is, indeed, a government. For example, courts do not assess "whether the country a foreign terrorist organization was trying to influence is acting illegally in some manner in order to determine whether the sentencing enhancement is appropriate." *Assi*, 428 Fed. App'x. at 575; *see also Assi*, 586 F. Supp. 2d at 851.

As addressed in greater detail below, the Defendant argues that after Syria fell into civil war, the government of Syria, led by President Bashar al-Assad ceased to be the real government. Specifically, the Defendant asserts that once Assad committed acts that violated international law, or was denounced by other nation states, his government ceased to be a true governmental entity.

C.    The Terrorism Sentencing Enhancement Applies to Defendant Harcevic Because the Offenses are Felonies that Involved, or Were Intended to Promote, a "Federal Crime of Terrorism"

In the present case, defendant Harcevic attempted and conspired with others to provide support to others (Pazara and his fellow fighters) in furtherance of a conspiracy to murder persons in Syria and elsewhere.  Pazara and his fellow fighters, as well as the groups to which they belonged and fought for, committed acts that were dedicated to overthrowing Assad and the Syrian government, as well as establishing a new governance, the Caliphate.  Pazara and his co-conspirators also fought against Kurdish people, Turkey, and Iraq.

As previously described, the Defendant knew Pazara committed acts in Syria and elsewhere that would constitute acts of terrorism and violence. The Defendant also knew Pazara, and more generally ISIS's openly stated goals and objectives were to overthrow the Syrian government.  Harcevic's support included sending money to Pazara on more than one occasion. His support also included participating in discussions about Pazara's actions, the success or failure of various attacks and operations, the success and failure of ISIS actions in Syria, and the status of affairs in Syria regarding operations against Assad.

At his plea, the Defendant admitted he "believe[d] that Pazara used at least part of the money for himself and other Bosnians in the effort to fight against Assad." Def. Exhibit p. 15.  He

also said, "my most intention, but there is always—I mean in order to stop a dictator [Assad] or somebody who is going on people to destroy them there is no other way than to put yourself in front of the oncoming soldier and fight against it. So I agree to that." *Id*. p. 17  By his own words, the Defendant knew he was supporting a conspiracy calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

1.    The counts of conviction are offenses enumerated in
18 U.S.C. § 2332b(g)(5)(A)

On February 25, 2019, Harcevic pled guilty to Counts I and III of the Indictment.  These counts constituted violations of 18 U.S.C. § 2339A. Count I was conspiracy to provide material support in furtherance of a violation of § 956.  Count III was a substantive violation of providing material support in furtherance of a violation of § 956.  The list of qualifying statutes under 18 U.S.C. § 2332b(g)(5)(A) includes 18 U.S.C. § 2339A, therefore this element is satisfied.

2.    Defendant Harcevic's conduct was calculated to influence or affect the
conduct of government as required in 18 U.S.C. § 2332b(g)(5)(A)

Based on the facts previously outlined Harcevic's commission of the offenses was certainly "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  Harcevic specifically admitted as much in this plea.

The Court is well aware of ISIS's terrorist acts and atrocities in Syria and the surrounding region.  ISIS's publically stated goal was to overthrown Assad and establish a new government. Every act undertaken by those affiliated with ISIS was designed to accomplish this mission.  This included all of Pazara's previously described acts.

35

The defense argues that the United States supported the FSA or other groups and this negates application of the enhancement.  This is incorrect and recalls the unavailing arguments made by the defense regarding combatant immunity.  Furthermore, the defense offers scant factual support for their claims other than citations to media statements.

In their Motion to Dismiss and Reply, ECF No. 390, 409, the defense argued that a purported OFAC license issued to a particular group would provide a general license for members of the public to engage in conduct that otherwise would implicate the Syria Sanctions Program, even though the OFAC license expressly disclaimed general licensure.  Here, as in the case of the purported OFAC license, the defense's argument proves too much. If the defense were correct, then by issuing a specific license to any group, or by undertaking any action by the Executive Branch, the United States would actually be authorizing every member of the public to engage in actions properly reserved to the Government.

The Defendant's underlying conduct and actions demonstrated his knowledge of what Pazara and his were conspirators were doing individually and to further the overall goals of the groups for whom they fought.  In sum, the offenses for which Harcevic was convicted, violations of 18 U.S.C. § 2339A, are "federal crime[s] of terrorism."  Harcevic admitted his role in the offenses.  His knowledge and underlying actions leave no ambiguity regarding his intent to support Pazara and his fellow fighters. His actions were intended and calculated among other things, to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

D.    The Argument That the Assad Government Was Not the Government of Syria Is
        Incorrect

The defense argues that Harcevic's offenses were not calculated to influence or affect the conduct of government or to retaliate against government conduct because his offense was aimed against the Assad government, which the defense argues was not the government of Syria. Even if the offense was only geared against the Assad government, this would clearly be a sufficient basis to apply the terrorism sentencing enhancement: the Assad government was indeed the government of Syria. Additionally, the offenses were also calculated to influence, affect, and retaliate against other governments in addition to the Syrian government, which provides another basis to apply the enhancement.

First, it is important to distinguish three concepts: recognition of a foreign state, recognition of a foreign government, and maintenance of diplomatic relations. Recognition of a foreign state and recognition of a foreign government are different. Specifically,

> Recognition of a state is formal acknowledgment that the entity possesses the qualifications for statehood, and implies a commitment to treat the entity as a state. See § 202, Comment a. Recognition of a government is formal acknowledgment that a particular regime is the effective government of a state and implies a commitment to treat that regime as the government of that state.

Restatement (Third) of Foreign Relations Law of the United States § 203, Comment a.[15]

Similarly, recognition and derecognition of a foreign government is distinct from maintenance or suspension of diplomatic relations with a foreign state. Although recognition of a government often is signified by engagement between diplomatic representatives, this is not

---

[15] *See also* Restatement (Third) of Foreign Relations Law of the United States § 201 ("Under international law, a state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities.)

always the case.  The Government may recognize a foreign government without engaging in diplomatic relations.  *Id.* § 203, Comment d.  Furthermore, discontinuing diplomatic relations does not constitute derecognition of the foreign government, even if the purpose of discontinuing diplomatic relations is to express disapproval of the foreign government.  *Id.*

Second, derecognition is effected when a government recognizes another regime as the government.  *Id.*, Comment f.  Derecognition without recognition of a new government is rare.  *Id.*

Third, and most important for this litigation, recognition and derecognition of foreign governments is a matter of national policy, *id.* Reporters' Notes 1, and questions of recognition and derecognition under U.S. law are determined by the Executive Branch.  *Zivotofsky v. Kerry*, __ U.S. __, 135 S. Ct. 2076, 2084, 2090 (2015) ("*Zivotofsky II*").  The Supreme Court recently affirmed that, as a matter of separation of powers, the Executive Branch determines whether the United States will recognize foreign governments.  *Id.* at 2090—91 ("[J]udicial precedent and historical practice teach that it is for the President alone to make the specific decision of what foreign power he will recognize as legitimate, both for the Nation as a whole and for the purpose of making his own position clear within the context of recognition in discussions and negotiations with foreign nations.").  The President's determination of matters of recognition are "conclusive on the judicial department."  *Id.* at 2088 (quoting *Williams v. Suffolk Ins. Co.*, 13 Pet. 415, 420 (1839)).  Recognition of a foreign government may be effected by an express written or oral declaration, or be implied, such as by concluding a treaty.  *Zivotofsky II*, 135 S. Ct. at 2084.

In this case, the defense argues that a number of statements, offered without context, provide a basis for the Court to conclude that the United States derecognized the government of

Syria.  This incorrect, even assuming the veracity of the quotes proffered without citation by the defense.

Executive Branch officials have criticized the Syrian government and its actions.  But the United States has not derecognized the Syrian government.  For example, in President Obama's statement on August 31, 2013, the President characterized the Assad regime's chemical weapons attack as "an assault on human dignity [and] a serious danger to our national security."  Press Release, Barack Obama, White House, Statement by the President on Syria (Aug. 31, 2013), https://obamawhitehouse.archives.gov/the-press-office/2013/08/31/statement-president-syria. Even in this extreme circumstance, the President left no doubt as to who the United States recognizes as the government of Syria, in that the President stated, "Yesterday the United States presented a powerful case that the *Syrian government* was responsible for this attack on its own people," and, "Several hundred [of the victims] were children -- young girls and boys gassed to death *by their own government*."  *Id.* (emphasis added).  The President went on to say that,

> we'll continue to support the Syrian people through our pressure on the Assad regime, our commitment to the opposition, our care for the displaced, and our pursuit of a political resolution that achieves a government that respects the dignity of its people.

*Id.*  To the extent that the defense proffers statements that indicate disapproval or condemnation of the Assad government, this is distinct from derecognition.  *See* Restatement (Third) of Foreign Relations Law of the United States § 203, Comment a.

Numerous statements and actions by Executive Branch and its officials reflecting that Assad is "in power" or referring to his "regime" substantiate that the Government, while doubtless critical of the Syrian government and its actions, never derecognized the Syrian government.  For

example, on May 18, 2011, the President provided for economic sanctions against "senior officials

of the government of Syria," and includes as an annex a list of designated senior officials including

Bashar al-Assad. Exec. Order No. 13,573, 76 Fed. Reg. 29,143 (May 20, 2011).  This executive

order remains in force.

> The State Department made the point abundantly clear in 2012, stating,

> The U.S. Department of State announced at the Friends of the Syrian People meeting in December 2012 that the United States was recognizing the Syrian Opposition Coalition ("SOC") as the legitimate representative of the Syrian people. *The United States does not recognize the SOC as the government of Syria.*

> Office of the Legal Adviser, Dep't of State, *Digest of United States Practice in International Law 2012* (CarrieLyn D. Guymon ed., 2012), https://2009-2017.state.gov/documents/organization/211955.pdf (emphasis added).[16]

> Thereafter, on September 10, 2013, the Department of State published the following notice

in the Federal Register:

> The United States Government has determined on August 2, pursuant to Section 306(a) of the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991, 22 U.S.C. 5604(a), that *the Government of Syria* has used chemical weapons in violation of international law or lethal chemical weapons against its own nationals.

---

[16] "The Office of the Legal Adviser [of the Department of State] publishes the annual Digest of United States Practice in International Law to provide the public with a historical record of the views and practice of the Government of the United States in public and private international law." *Digest of United States Practice in International Law 2012*, U.S. Dep't of State, https://2009-2017.state.gov/s/l/2012/index.htm (last visited May 30, 2019).

Determinations Regarding Use of Chemical Weapons in Syria Under the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991, 78 Fed. Reg. 55,326 (Dep't of State Sept. 10, 2013) (emphasis added).

As discussed in the Government's Opposition to the Defendants' Motion to Dismiss the Indictment, on September 23, 2014, the United States' representative to the United Nations sent a letter pursuant to Article 51 of the United Nations ("U.N.") Charter to the U.N. Secretary-General regarding the international law basis for the U.S. and coalition partners' use of force in Syria against non-State groups including AQI/ISIS (referred to in the letter as ISIL). Permanent Rep. of the United States of America to the U.N., Letter dated Sept. 23, 2014 from the Permanent Rep. of the United States of America to the U.N. Secretary-General, U.N. Doc. S/2014/695 (Sept. 23, 2014). In that letter, the United States observes that the Assad regime – as the government of Syria – is unwilling or unable to confront the AQI/ISIS threat itself. This is yet another reflection that the United States never derecognized the government of Syria.

No matter how critical the Government has been of the Assad regime, the Government has never ceased to recognize it as the Syrian government. In Secretary Kerry's remarks of September 24, 2014, the Secretary stated:

> Let me make it clear to all those who are part of that effort that for all of the men and women who make up the moderate Syrian opposition, we stand behind you today. We have stood behind you in these last years. I know sometimes there's been a greater desire for more, but we will continue to stand beside you as long as ISIL remains a threat and *Assad remains in power*.

Press Release, John Kerry, Secretary of State, Remarks at Syria Ministerial (Sept. 24, 2014), https://2009-2017.state.gov/secretary/remarks/2014/09/232086.htm (emphasis added).

41

Finally, the United States has never indicated that an entity other than the Assad Regime should be considered as the government of Syria, e.g., by expressly recognizing another institution as the government, accrediting its diplomats, or facilitating its control over Syrian state assets.  The Department of State's public fact sheet regarding "U.S. Relations with Syria," notably lacks any suggestion that the Assad regime is not the government of Syria, or that some other entity is the recognized government.  Bureau of Near Eastern Affairs, *U.S. Relations with Syria*, U.S. Dep't of State (July 23, 2018), https://www.state.gov/u-s-relations-with-syria/.  This is in spite of the fact that, "The U.S. Government is continuously identifying and designating individuals and entities subject to U.S. sanctions related to Syria, including but not limited to the Syrian regime's use of chemical weapons and other atrocities against its own people," and in spite of the fact that the U.S. Embassy in Damascus suspended its operations in February 2012, and on March 18, 2014, the State Department notified the Syrian Embassy in Washington, DC, that their operations must be suspended immediately.  *Id.*  As noted above, altering or discontinuing diplomatic relations does not constitute derecognition.  This is especially obvious where, as here, the United States consistently refers to the government of Syria as such, and undertakes actions to hold that government accountable for its actions, e.g., in the area of chemical weapons.

For these reasons, the defense's argument that the Assad government was not the government of Syria is wrong.

As established above, Harcevic's offenses were indeed calculated to influence or affect the conduct of government or to retaliate against government conduct.  The defense concedes this as

to the Assad government, i.e., the Syrian government, and the Government here proffers further evidence and exhibits with respect to the Syrian government and other governments.

## VI.    __Conclusion__

WHEREFORE, for the Government respectfully requests that the Court consider and adopt the facts and evidence outlined in this Response and adopt the PSR as its findings of fact and conclusions of law.

Respectfully Submitted,


JEFFREY B. JENSEN
United States Attorney

_/s/ Joshua D. Champagne_
JOSHUA D. CHAMPAGNE – 1013246DC
Trial Attorney – NSD/Department of Justice

_/s/ Matthew T. Drake_
MATTHEW T. DRAKE – 46499MO
Assistant United States Attorney

_/s/ Howard J. Marcus_
HOWARD J. MARCUS – 29756MO
Assistant United States Attorney

_/s/ Kenneth R. Tihen_
KENNETH R. TIHEN – 37325MO
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the United States' Sentencing Memorandum and Response to Defendant's Objections was provided to defense counsel via electronic mail and will be electronically filed and served on the Court's electronic filing system.

Dated:            June 3, 2019


JEFFREY B. JENSEN
United States Attorney

*/s/ Matthew T. Drake*
MATTHEW T. DRAKE – 46499MO
Assistant United States Attorney